UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LOTHAMER TAX RESOLUTION, INC., et al.,

               Plaintiffs,                                   Hon. Hala Y. Jarbou

v.                                             Case No. 1:25-cv-579

PAUL KIMMEL, et al.,

               Defendants.

_____/

## REPORT AND RECOMMENDATION

Plaintiffs Lothamer Tax Resolution, Inc., Lothamer Consulting Servies, LLC, and Lothamer Franchise Corporation (collectively, Lothamer) have sued former Lothamer employee, Paul Kimmel, alleging that Kimmel: (1) violated the Stored Communications Act (SCA), 18 U.S.C. § 2707(a), the Computer Fraud & Abuse Act (CFAA), 18 U.S.C. § 1030(a), the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1839, and the Michigan Uniform Trade Secrets Act (MUTSA), Mich. Comp. Laws § 445.1901; (2) breached his Employment Contract and Non-Disclosure Agreement with Lothamer; and (3) committed torts of fraud in the inducement and common-law/statutory conversion, all arising out of his employment with Lothamer.

Presently before me are Lothamer's Motion for Preliminary Injunction (ECF No. 2) and Lothamer's Motion for a Temporary Restraining Order (ECF No. 87), which I address as a preliminary injunction because Kimmel has filed a response. The motions are fully briefed, and I have accepted Lothamer's supplemental brief in support of its Motion for a Temporary Restraining Order. (ECF No. 100.) For the reasons that follow, I recommend that the Court **GRANT** both motions and issue injunctive relief.

# I.  **Background**[1]

Lothamer provides professional tax services. In 2024, Lothamer decided to make upgrades to improve its software capabilities. (ECF No. 1 at PageID.3.) Lothamer wanted the software to do several things post-upgrade, including intake documents, provide clients a convenient payment method, and schedule payments for clients. These capabilities were Lothamer trade secrets that set its approach apart from standard industry practices by allowing clients to track fees incurred and retainer refunds, use digital signatures to execute Internal Revenue Service powers of attorneys, and use video consultation services. The "Scheduled Deposits" feature, which provided a novel way for clients to pay for Lothamer's services in the tax-resolution and advocacy space, was particularly important to Lothamer for both business development and management aspects. The Scheduled Deposit program also provided significant franchise opportunities to Lothamer's partners and potential partners in the tax-resolution industry. (*Id.*) Lothamer had previously engaged two outside companies to develop these features, but they failed to produce functioning programs, so Jesse Lothamer, Lothamer's majority owner and chief executive officer, decided to bring the project in-house to provide better access to the project, expedite its completion, and improve its cost management. (*Id.* at PageID.5.)

Lothamer learned of Kimmel through a staffing agency it had engaged to find a specialist to complete the software update. Jesse interviewed Kimmel because his resume indicated that he was particularly experienced and very competent in the field of computer engineering and programming, as his resume stated that he had been a "100% full stack, hands-on architect for 20+ years." (*Id.* at PageID.6; ECF No. 1-1 at PageID.47.) At that time, Lothamer's software was in computer language known as "PHP," or "PHP: Hypertext Preprocessor." Kimmel told Jesse that

---

[1] The factual background set forth herein is taken from Lothamer's verified complaint.

he could learn PHP even though he said he worked best in an alternative language known as "C-Sharp." In the interview, Kimmel assured Jesse that he could "program anything," and pointed to his prior experience writing similar computer programs at Hillsdale College. Kimmel knew the position paid a six-figure salary and said that he was seeking compensation of at least $200,000. (ECF No. 1 at PageID.6–7.)

Based on Kimmel's representations regarding his experience and assurances regarding his programming abilities, Jesse determined that Kimmel was the right candidate for the position and hired him as the in-house leader to complete the Scheduled Deposits program—Lothamer's most important trade secret because of its monetary and strategic value—in addition to other updates and maintenance of Lothamer's computer system. (*Id.* at PageID.7–8.) During compensation discussions, Kimmel requested an equity interest in Lothamer for his programming work based on a past negative experience with a prior employer, but Jesse refused to grant such interest. Instead, the parties discussed the possibility of a "royalty" payment for Kimmel's work, but in the end, they agreed to a bonus arrangement pursuant to a written Bonus Agreement executed on Kimmel's start date of June 10, 2024. The agreement acknowledged that the parties had agreed to the bonus arrangement in lieu of a royalty or any other agreement concerning Kimmel's compensation. (*Id.* at PageID.8–9; ECF No. 1-2.) In addition to the Bonus Agreement, the parties entered into a binding Employment Contract:

- Requiring Kimmel to return all confidential information to Lothamer upon its request or demand within two weeks from the date his employment was terminated.
- Precluding Kimmel from communicating or disclosing to any other person, during or after the term of the agreement, any confidential knowledge of information acquired during his employment with Lothamer.
- Precluding Kimmel from disparaging Lothamer, its officers, directors, current and former employees, or other agents, after signing the agreement, on internet complaint boards, social media sites, and employment sites, upon penalty of $1,000 per day that the negative remark remained posted.

3

(ECF No. 1-3 at PageID.57–59.) The parties also entered into a Non-Disclosure Agreement which, among other things:

- Confirmed that Lothamer was disclosing its confidential information to Kimmel to allow him the ability to serve as Lothamer's Chief Technology Officer (CTO).
- Defined "Confidential Information" broadly, including software programming, processes, trade secrets, source code, and intellectual property.
- Precluded Kimmel from using "Confidential Information" outside of the stated purpose of serving as Lothamer's CTO or for any unpermitted purposes and from disclosing such information to anyone and required him take all reasonable steps to protect its secrecy and prevent it from falling into the public domain or the possession of unauthorized persons.
- Requiring Kimmel to promptly return any materials or documents that Lothamer furnished, including copies, after termination of the employment relationship.

(ECF No. 1 at PageID.11–12; ECF No. 1-4 at PageID.62–63.) Finally, Lothamer agreed to Kimmel's suggestion to hire two of his friends to assist him in completing the Scheduled Deposits Program, imposing additional costs to Lothamer for the work. (ECF No. 1 at PageID.9.)

Kimmel initially promised that he would deliver a fully-functioning Scheduled Deposits program to Lothamer by the end of December 2024, which reinforced Lothamer's belief that Kimmel possessed the knowledge and skill to complete the job. Early in his tenure with Lothamer, Kimmel learned of the prior CTO's opinion that the portal project was unsalvageable and that the existing code was "absolutely the worst code" he had ever seen. (ECF No. 1-6.) Kimmel declared that this view was "[t]oo much doom and gloom." (*Id.*) During the remainder of 2024 and into January of 2025, Kimmel maintained that Lothamer need not rewrite its code but instead should perform upgrades, even in response to Lothamer's lay inquiries whether the portal, and particularly the Scheduled Deposits program, needed to be rewritten. (ECF No. 1 at PageID.14–15; ECF No. 1-5 at PageID.10.) Kimmel failed to complete the Scheduled Deposits program by the end of 2024, and in January 2025, after Lothamer began to question why it should continue to pay Kimmel and his team when they had produced no results, Kimmel presented a new plan and timeline, along

with "Milestones and Objectives." (ECF No. 1-7 at PageID.90.) Notwithstanding this new schedule, Kimmel failed to complete all the "Milestones and Objectives" he created. (ECF No. 1 at PageID.15.)

Despite his representations that he would learn PHP code, Kimmel began to unilaterally replace the portal's PHP code with C-Sharp code, which caused system errors and interfered with other Lothamer employees' work functions. (*Id.* at PageID.16.) Due to tech issues that professionals were reporting in 2024, Lothamer requested monthly meetings with Kimmel to review his progress on updates and maintenance, but Kimmel put off those requests and ignored Jesse's calls. Kimmel finally accepted a meeting to discuss his lack of progress and sent Lothamer a document titled "Year to Date Status for 2025 (from June 2024)." (ECF No. 1-5.)

In early February 2025, Kimmel said that he had an "epiphany" and realized that Lothamer's portal did, in fact, require a rewrite because the existing code was "brittle." (*Id.* at PageID.19.) Kimmel said that he needed six months to secure the portal and that the complete rewrite would take at least 18 months. (*Id.*) Shortly thereafter, Kimmel changed his mind and determined he could begin a rewrite immediately, instead of in six months. (*Id.* at PageID.20.) At some point in February, Jesse met with Kimmel and told Kimmel that he planned to terminate him. Kimmel appeared surprised and said that he planned to finish the project by the following week. Jesse acquiesced, but instead of giving Kimmel one week, gave him three weeks to finish the project. Even after four weeks, however, Kimmel failed to produce anything that was usable. (*Id.* at PageID.21.) Instead, Kimmel produced a one-page document that was incapable of doing anything. (*Id.* at PageID.21–22; ECF No. 1-9.)

On March 7, 2025, Jesse terminated Kimmel's employment with Lothamer due to his failure to deliver on his promised performance. About a month later, in response to the termination,

Kimmel sent Lothamer a demand letter accusing it of violating various regulations and laws in the course of his business, as well as asserting that Lothamer committed unlawful acts in connection with Kimmel's employment, including violating the Michigan Whistleblower Protection Act. (ECF No. 1-8.) In his damage summary requesting a 10% equity interest, Kimmel calculated its value at $630,000, "based on a $6.3M company valuation." (*Id.* at PageID.97.) Prior to this time, Jesse had engaged an outside company to value Lothamer and had not shared the information with anyone. (ECF No. 1 at PageID.23.) Kimmel never had authorization to access, view, or download Jesse's personal email account, where the valuation was stored. (*Id.* at PageID.24.)

## II.   Motion Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A court should grant an injunction "only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

In ruling on a motion for a preliminary injunction, a court considers four factors: "(1) whether the plaintiffs are likely to succeed on the merits; (2) whether the plaintiffs will suffer irreparable injury in the absence of an injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) whether the issuance of the injunction is in the public interest." *Michigan State AFL–CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997). These are factors to be balanced, not prerequisites that must be met. *See Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir. 1994). A district court need not make specific findings on each of the four factors if fewer factors are dispositive of the issue. *See In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985). Stated slightly differently, "[w]here the three factors other than the likelihood of success all strongly favor issuing the injunction, a district court is within its discretion in issuing a preliminary

6

injunction if the merits present a sufficiently serious question to justify a further investigation." *Little Caesar Enters., Inc. v. R–J–L Foods, Inc.*, 796 F. Supp. 1026, 1030 (E.D. Mich. 1992). "However, 'the likelihood of success on the merits often will be the determinative factor.'" *Wilson v. Williams*, 961 F.3d 829, 837 (6th Cir. 2020) (citing *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 689 (6th Cir. 2014)).

## III.  Analysis

As noted, Lothamer has filed two motions seeking injunctive relief against Kimmel. The first motion, which Lothamer filed along with its complaint, requests that the Court order Kimmel: (1) to return all of Lothamer's trade secrets that are in his possession; (2) destroy any copies of Lothamer's trade secrets that he possesses; (3) not use any of Lothamer's trade secrets; and (4) identify every human and/or organization with whom Kimmel shared any of Lothamer's trade secrets.

Lothamer filed its second motion seeking a temporary restraining order and preliminary injunction after it discovered that Kimmel had published an internet article it describes as a "hit piece" disclosing some of Lothamer's confidential information, proprietary information, and trade secrets. (ECF No. 87-1.) Lothamer states that, consequently, following Kimmel's posting, it has suffered and continues to suffer an unprecedented number of actual and potential cyber attacks on its computer system and portal. These attacks have hindered its ability to fully conduct its business. (ECF No. 87-2 at PageID.1309–10.) As a result, Lothamer requests that the Court: (1) order Kimmel to remove the article from the Internet that revealed Lothamer's confidential information, proprietary information, trade secrets, and any similar revelations of which Lothamer may not be aware; and (2) enjoin Kimmel from similar conduct in the future. (ECF No. 87 at PageID.1274.) In his response, Kimmel claims that he voluntarily removed the article sometime before July 24, 2025, but he admits that he republished the article on July 24, 2025, just one day after Lothamer

requested Kimmel's concurrence to its motion for a temporary restraining order. (ECF No. 88 at PageID.1346.) On July 31, 2025, I granted Lothamer's motion to file a supplemental brief in support of its motion for injunctive relief (ECF No. 100), which submits another article by Kimmel dated July 30, 2025, that, at a minimum, clearly violates his nondisparagement contractual obligations to Lothamer. (ECF No. 100-1.)

As mentioned above, because Kimmel has had an opportunity to respond to the second motion, I treat it as a motion for a preliminary injunction.

### A.    Likelihood of Success

As set forth above, Lothamer asserts numerous federal- and state-law claims in its complaint. Because Lothamer has demonstrated a likelihood of success on at least one of its claims, I "need not consider in detail the merits of each and every claim." *Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, & Kentucky, Inc. v. Cameron*, 599 F. Supp. 3d 497, 507 (W.D. Ky. 2022). "If [the moving party] can show a likelihood of success on the merits of any of the claims, an injunction may issue, subject to consideration of the other factors." *Hoover Transp. Servs., Inc. v. Frye*, 77 F. App'x 776, 781 (6th Cir. 2003); *see also Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005) ("Plaintiffs have asserted five constitutional and statutory claims. To obtain temporary injunctive relief, they must show a substantial likelihood of success on at least one claim."). I find that Lothamer has demonstrated a likelihood of success on its SCA, DTSA, and MUTSA claims.

### 1.    SCA Claim

An individual violates the SCA if he or she does either of the following: "(1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility; and thereby obtains,

alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system." 18 U.S.C. § 2701(a). "[E]lectronic storage" is "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof . . . and . . . any storage of such communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. § 2510(17). In addition, "[e]mails—whether read or unread—that are stored in a web-based email service are covered under the statute." *Mitchell, Lewis & Staver, Co. v. Valley Farms Supply, LLC*, No. 1:21-cv-555, 2025 WL 703778, at *3 n.3 (W.D. Mich. Mar. 5, 2025) (citing *Hately v. Watts*, 917 F.3d 770, 791–98 (4th Cir. 2019)). To succeed on its SCA claim, Lothamer must show that: (1) Kimmel accessed Jesse's personal email account; (2) Kimmel did so either without authorization or in a manner that exceeded his authorization; and (3) Kimmel's unauthorized access must have been intentional. *Id.* at *3.

Here, Lothamer has alleged by verified complaint that Kimmel accessed Jesse's email account.[2] In particular, it alleges that Kimmel confirmed his access to the Lothamer Valuation— which was kept in Jesse's personal email account and not shared with anyone—in his demand letter when he referred to "your own valuation of the company . . . ." (ECF No. 1 at PageID.23, 25.) Lothamer also alleges that Kimmel accessed Jesse's email without authorization because he

---

[2] Although Jesse is not a party to this action, I nonetheless conclude that Lothamer is an "aggrieved person" for purposes of 18 U.S.C. § 2701(a) because the SCA borrows the definition of "aggrieved person" from 18 U.S.C. § 2510(11). *See United States v. Councilman*, 418 F.3d 67, 81 (1st Cir. 2005) (noting that definitions from the Wiretap Act and the Electronic Communications Privacy Act, 18 U.S.C. § 2510 are incorporated into the SCA by 18 U.S.C. § 2711(a)); *Andrews v. Sirius XM Radio, Inc.*, No. ED CV 17-1724, 2018 WL 1406911, at *6 (C.D. Cal. Jan. 9, 2018) (same). Pursuant to 18 U.S.C. § 2510(11), "aggrieved person" is defined as ""a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." Lothamer alleges that Kimmel directed the intercepted Lothamer Valuation at it in his April 6, 2025 demand letter. (ECF No. 1 at PageID.23.)

never had permission to access Jesse's email account, and that such access was intentional. (*Id.* at PageID.26.) Thus, Lothamer has properly alleged an SCA claim and, in light of Kimmel's explicit reference to "your own valuation" in his demand letter, has shown a likelihood of success through its verified complaint and evidentiary submissions.

In his response to Lothamer's initial motion for preliminary injunction, Kimmel asserted that he did not possess and could not have obtained the information needed to access Jesse's personal email account. (ECF No. 11 at PageID.200.) He did not support his response with an affidavit or declaration. I have since permitted Kimmel to file a supplemental response attaching a declaration in which he claims that he did not access, or attempt to access, any personal or corporate email account belonging to Jesse or Lothamer and did not possess any passwords or login credentials, or two-factor authentication devices belonging to Jesse or Lothamer. (ECF No. 70.) Despite this declaration, I nonetheless conclude that, based on Kimmel's own statement in his demand letter and Lothamer's verified complaint, Lothamer has demonstrated a likelihood of success on this claim.

### 2.    DTSA and MUTSA Claims

Lothamer alleges claims for violation of the DTSA and MUTSA in Counts 3 and 4 of its complaint. The standards of DTSA and MUTSA "are almost identical." *Prudential Defense Sols., Inc. v. Graham*, 498 F. Supp. 3d 928, 938 (E.D. Mich. 2020). Thus, I consider both claims together in my analysis of the DTSA claim.

To establish a claim under the DTSA, a plaintiff must establish: "(1) 'the existence of a trade secret, defined generally as information with independent economic value that the owner has taken reasonable measures to keep secret[;]' (2) that 'is related to a product or service used in, or intended for use in, interstate or foreign commerce[;]' and (3) 'the misappropriation of that trade

secret, defined broadly as the knowing improper acquisition, [ ] use[,] or disclosure of the secret.'"

*Sigma Corp. v. Island Indus., Inc.* (*In re Island Indus., Inc.*), No. 23-5200, 2024 WL 869858, at *2 (6th Cir. Feb. 29, 2024) (quoting *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021) (quoting 18 U.S.C. §§ 1836(b)(1), 1839(3), (5))). A defendant may acquire a trade secret by "improper means" through "bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means," but not by "lawful means of acquisition." 18 U.S.C. § 1839(6).

### a.    Trade Secrets

To establish its DTSA claim, Lothamer must first show that it possesses trade secrets related to a product or service used in connection with interstate commerce. Regarding the interstate commerce requirement, there is no reasonable dispute that, to the extent Lothamer possesses trade secrets, those trade secrets relate to Lothamer's online provision of tax services used in interstate commerce. A trade secret may consist of

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing[.]

18 U.S.C. § 1839(3). It must "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]" *Id.* § 1839(3)(B). Finally, information will be protected as a trade secret only if the owner "has taken reasonable measures to keep such information secret[.]" *Id.* § 1839(3)(A).

Lothamer contends that its Scheduled Deposits program, the portal, and the Lothamer Valuation all constitute information that may be protected as a trade secret. Lothamer alleges in

11

its verified complaint that this information derives economic value from not generally being known and not being readily ascertainable through proper means by actual or potential competitors because it provides clients a unique way of paying for Lothamer's services and separates Lothamer's approach from standard industry practices (ECF No. 1 at PageID.4), and "increases (*a*) efficiency, (*b*) accuracy, (*c*) ease of use, and (*d*) franchise opportunities." (*Id.* at PageID.29.) Kimmel offers no evidence to refute these allegations.

Lothamer also asserts that it took reasonable measures to protect its trade secrets. The Sixth Circuit has observed that "whether efforts taken to maintain the secrecy of a trade secret are reasonable under the circumstances depends on the circumstances[.]" *Niemi v. NHK Spring Co.*, 543 F.3d 294, 301 (6th Cir. 2008) (citing *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 724–25 (7th Cir. 2003)). Reasonable measures include use of passwords, *see RECO Equip., Inc. v. Wilson*, No. 20-4312, 2021 WL 5013816, at *4 (6th Cir. Oct. 28, 2021) (finding that the plaintiff employer's efforts to protect its trade secrets were reasonable where "documents are password protected to keep them from broad distribution" and "[o]nly [the plaintiff's] employees whose positions require it are allowed access to the documents"); *The Rightthing, LLC v. Brown*, No. 3:09 CV 135, 2009 WL 249694, at *8 (N.D. Ohio Feb. 2, 2009) (use of computer passwords sufficient to show that the plaintiff had "gone out of [its] way to protect . . . files"), and confidentiality agreements, *see Sigma Corp.*, 2024 WL 869858, at *3 (noting that "courts have considered 'physical security measures at facilities and confidentiality agreements,' among other efforts 'relating to sensitive information'" (quoting *United States v. Shanshan Du*, 570 F. App'x 490, 500 (6th Cir. 2014))). Lothamer alleges that it "used password protection, utilized encryption, and limited user access" to protect its trade secrets and also limited access to employees for the "specific purpose within their scope of employment." (*Id.*) In addition, Lothamer used non-

12

disclosure agreements with its employees, including Kimmel. (ECF No. 1-4.) Such agreements broadly defined "Confidential Information," required the employee to refrain from disclosing such information "for any unpermitted purpose" and affirmed that all "Confidential Information" remained Lothamer's exclusive property. (*Id.* at PageID.62.) In particular, Kimmel's agreement limited his use of "Confidential Information" to his performance of duties as Lothamer's CTO. (*Id.*)

Kimmel has not refuted Lothamer's showing with any persuasive argument or admissible evidence. In his response to the initial motion for preliminary injunction, he argues that the Scheduled Deposits program "was developed openly within [Lothamer's] organization." (ECF No. 11 at PageID.200.) Even if true, this unsupported statement would not preclude Lothamer from claiming trade secret protection, as accepting it would preclude any company from using multiple employees to develop and use a trade secret. Moreover, Kimmel presents no admissible evidence showing that Lothamer employees who worked on or with the Scheduled Deposits program were not subject to the protections Lothamer has shown it employed.[3]

### b.    Acquisition of Trade Secrets

A plaintiff may show misappropriation through "three theories of liability: (1) acquisition, (2) disclosure, or (3) use." *Investment Sci., LLC v. Oath Holdings Inc.*, No. 20 Civ. 8159, 2021 WL 3541152, at *5 (S.D.N.Y. Aug. 11, 2021) (internal quotation marks omitted); *see also Sigma*

---

[3] Kimmel's other arguments are immaterial. First, he contends that Lothamer retained full access to its systems. (ECF No. 11 at PageID.200.) Nothing about this fact defeats Lothamer's trade secrets claims. Second, he contends that "[t]he so-called 'valuation' document was widely inferred from company discussions and public industry benchmark (e.g., 1 x revenue)." (*Id.*) It is not clear whether this statement refers to the Lothamer Valuation that Jesse had prepared by the outside Texas-based company or to Kimmel's assertion of Lothamer's value in his demand letter, but in either case Kimmel has presented no admissible evidence supporting this assertion. His June 6, 2025 declaration (ECF No. 70-1) provides no actual factual support for either allegation.

*Corp.*, 2024 WL 869858, at *3 (misappropriation includes (1) knowing improper acquisition; (2) use; or (3) disclosure); *Allergan, Inc. v. Revance Therapeutics, Inc.*, 711 F. Supp. 3d 873, 885 (M.D. Tenn. 2024) (a plaintiff alleging acquisition must show that it was accomplished through "improper means," but a plaintiff alleging use or disclosure need not show that the defendant acquired the trade secret by "improper means").

Lothamer relies solely on a theory of improper acquisition. It alleges that Kimmel acquired the Scheduled Deposits program, the portal, and the Lothamer Valuation through improper means because he possessed them without authorization. (*Id.* at PageID.30.) More specifically, it alleges that Kimmel knowingly acquired the Scheduled Deposits program and portal improperly because he took possession of them when he no longer had permission to possess them, and Kimmel knew he never had permission to possess the Lothamer Valuation. (*Id.* at PageID.32.)

Lothamer's access theory is somewhat problematic with regard to both the Scheduled Deposits program and the portal. There is no question that Kimmel currently possesses Lothamer's trade secrets on his own personal computer, as he admits as much in his filings in this case and has confirmed this fact in a previous hearing. (ECF No. 11 at PageID.200; ECF No. 70 at PageID.996.) As Lothamer implicitly concedes, however, during his employment, Kimmel properly accessed its trade secrets in the normal course of performing his employment duties. "When one acquires information as part of their job duties, they are not using improper means." *Harley Marine NY, Inc. v. Moore*, 716 F. Supp. 3d 21, 31 (N.D.N.Y. 2024) (citing *Zurich v. Am. Life Ins. Co. v. Nagel*, 538 F. Supp. 3d 396, 405 (S.D.N.Y. 2021)). Lothamer does not allege that Kimmel downloaded this information to his own computer following his termination as CTO, which would have rendered his access improper. *Id.* It also does not allege that Kimmel acted improperly during the course of his employment by downloading the information to his own personal computer in

14

violation of his Employment Agreement or his Non-Disclosure Agreement, Lothamer's Employee

Handbook, or its technology policy. *See eShares, Inc. v. Talton*, 727 F. Supp. 3d 482, 493–94

(S.D.N.Y. 2024) (noting that the DTSA's definitions of "misappropriation" and "improper means"

"make clear that [improper means] requires a level of impropriety that merely accessing or

downloading documents onto a personal device does not implicate;" instead, "transferring

confidential information and trade secrets to a personal account can constitute acquisition by

improper means under the DTSA when two elements are met: (1) the employee was directed not

to share the information outside of employer-issued devices – whether, for example, through a

policy or employment-related contract; and (2) the employee transferred the information outside

of an employer-issued device for an improper or illegitimate purpose" (citing, among others,

*Lodging Sols., LLC v. Miller*, No. 19-CV-10806, 2020 WL 6875255, at *3 (S.D.N.Y. Nov. 23,

2020))); *Brown & Root Indus. Servs., LLC v. Brown*, No. 21-291, 2022 WL 4492087, at *11–12

(M.D. La. Sept. 9, 2022) (holding that the plaintiff properly alleged improper acquisition because,

while the defendants were authorized to access and copy the confidential information given their

employment positions with the plaintiff, the plaintiff's technology policies did not permit them to

use external devices to copy information); *AUA Private Equity Partners, LLC v. Soto*, No. 1:17-

cv-8035, 2018 WL 1684339, at *5–6 (S.D.N.Y. Apr. 5, 2018) (holding that the plaintiff

sufficiently alleged the defendant's improper access by uploading the plaintiff's trade secrets to

her personal Google Drive account in violation of her confidentiality agreements and the plaintiff's

policies and procedures prohibiting employees from transferring work-related information to their

personal devices). At bottom, as to the Scheduled Deposits program and the portal, Lothamer's

current verified pleading alleges only improper retention of properly accessed trade secrets, which

does not amount to improper access under the DTSA. *See Apple Inc. v. Rivos, Inc.*, No. 5:22-cv-

02637, 2023 WL 5183034, at *7 (N.D. Cal. Aug. 11, 2023) (noting that "allegations that former employees merely possessed or failed to return lawfully acquired information are insufficient by themselves to establish misappropriation or show injury under the DTSA"); *Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1066 (N.D. Ill. 2020) ("[T]he failure to return lawfully acquired information does not constitute 'misappropriation' of that information under the DTSA." (citing *Prominence Advisors, Inc. v. Dalton*, No. 17-C-4369, 2017 WL 6988661 at *4 (N.D. Ill. Dec. 18, 2017))).

Notwithstanding the foregoing analysis, Lothamer has shown a likelihood of success on its DTSA/MUTSA claims pertaining to Kimmel's improper access of the Lothamer Valuation, as Kimmel never had authorization to access Jesse's personal email account and had no need for that information as part of his employment duties. In addition, although not alleged in Lothamer's current pleading, Kimmel's disclosure of Lothamer's trade secrets in his June 28, 2025 and July 24, 2025 LinkedIn posts (ECF No. 87-1) would likely support an improper disclosure/use claim under the DTSA and/or MUTSA.

### 3. Breach of Contract

Although Lothamer does not specifically address the likelihood of success of its breach of contract claim in support of its motions for injunctive relief, it references Kimmel's breaches throughout its various briefs. For example, regardless of trade secret status, the Scheduled Deposits program, portal, and Lothamer valuation are Lothamer's confidential information that Kimmel agreed to return within two weeks of the termination of his employment. (ECF No. 1-3 at PageID.57.) And under the Non-Disclosure Agreement, Kimmel agreed not to disclose Lothamer's confidential information to anyone. (ECF No. 1-4 at PageID.62.) Moreover, Kimmel's June 28, 2025 and LinkedIn posts and his July 30, 2025 LinkedIn post (ECF No. 1001-1), both of which

16

clearly "make negative comments" about Lothamer, violate the non-disparagement clause of his Employment Contract. (ECF No. 1-3 at PageID.59.)

Kimmel offers various justifications for his conduct, but they all miss the mark. First, he suggests that his retention of Lothamer's trade secrets/confidential information is justified as preservation of evidence to support claims he has asserted against Lothamer, including the Whistleblower Protection Act claim. (ECF No. 11 at PageID.200–01.) The argument lacks merit, as Kimmel cites no authority excusing an employee's retention of his employer's trade secrets/confidential information in violation of his contractual obligations based on his interest in preserving evidence. *Cf. Jones v. St. Jude Med. S.C., Inc.*, 823 F. Supp. 2d 699, 743 (S.D. Ohio 2011) ("[E]mployees are not excused from the consequences of violating a company policy even if the employee breaks the rule to preserve evidence in litigation."). Kimmel's interest in preserving evidence does not trump his contractual obligations, especially because he has alternative means of seeking such evidence through discovery mechanisms. *See Watkins v. Ford Motor Co.*, No. C-1-03-033, 2005 WL 3448036, at *8 (S.D. Ohio Dec. 15, 2005) ("The fact that plaintiff purportedly obtained the documents for use in a lawsuit does not excuse his conduct, particularly since plaintiff could have sought that information by securing counsel and going through the proper legal channels."). Nor has he explained why he has retained the information rather than presenting it to any regulatory or law enforcement agency.

Second, Kimmel claims that his LinkedIn postings were protected by the First Amendment, but his argument is misplaced, as "the First Amendment does not apply to private companies like [Lothamer]." *Romano v. Blue Cross Blue Shield of Mich.*, No. 2:21-cv-12966, 2022 WL 19188, at *3 (E.D. Mich. Jan. 3, 2022). Moreover, even if the First Amendment arguably applied to

Kimmel's activity, he contracted away his right to speak by signing the Employment Agreement and Non-Disclosure Agreement. *Ostergren v. Frick*, 856 F. App'x 562, 569–70 (6th Cir. 2021).

### B.    Irreparable Harm

Lothamer must also demonstrate that it will suffer irreparable harm in the absence of injunctive relief. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). "[H]arm is not irreparable if it is fully compensable by money damages," but "an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." *Id.* As the Sixth Circuit has observed, a "'competitive injury' is one such irreparable harm." *RECO Equip.*, 2021 WL 5013816, at *5. This is particularly true where "loss of goodwill" and "trade-secrets" are at issue. *Id.*

Here, Lothamer has sufficiently demonstrated the potential for irreparable harm to warrant injunctive relief. It is undisputed that Kimmel possesses Lothamer's trade secrets/confidential information, giving Kimmel the ability to inflict injury on Lothamer, both competitive and non-competitive. For example, Lothamer has shown that Kimmel has started a competing business in the tax resolution space, https://www.cheaptaxsolutions.com/, giving Kimmel a prime opportunity to exploit Lothamer's information. (ECF No. 38 at PageID.348 n.3.) In fact, Kimmel advertised his new business in his June 28, 2025/July 24, 2025 post.[4]  (ECF No. 87-1.) Moreover, as Lothamer has shown, Kimmel disclosed some of Lothamer's confidential information in the foregoing post. And Lothamer has provided evidence showing that it suffered real harm following Kimmel's post. (ECF No. 87-2 at 1309–10; ECF No. 87-3 at PageID.1320–21.) Money damages flowing from this

---

[4] Kimmel's analogy of his LinkedIn post to PACER is unpersuasive. The information Kimmel posted was widely available for all to see without need of an account or a password. PACER, on the other hand, requires an account, and the information contained in an exhibit is not readily available, as are Kimmel's posts on LinkedIn.

harm would certainly be difficult to calculate. Given Kimmel's pattern thus far of attacking Lothamer online and disclosing its confidential information, Lothamer's concern of potential harm is well-founded.

### C.    Substantial Harm to Others

I conclude that this factor supports issuance of the requested injunctive relief because there is no indication that an injunction will harm third parties. Moreover, Kimmel fails to demonstrate persuasively that he will be harmed by the relief Lothamer requests. *See Overstreet v. Lexington–Fayette Urban Cnty. Gov't*, 305 F.3d 566, 579 (6th Cir. 2002) (harm to others includes harm to a defendant). As discussed above, Kimmel possesses Lothamer's trade secrets/confidential information that he was contractually bound to return to Lothamer. He has no legitimate need for that information, as he may have access to it in a controlled manner during discovery in this action. Moreover, the proposed injunctive relief does not preclude Kimmel from engaging in his profession or otherwise preclude him from pursuing a livelihood. Therefore, requiring him to return the information to Lothamer, destroy all copies and not use it, and identify those to whom he has disclosed it poses no harm, let alone substantial harm, to Kimmel. As for the relief Lothamer seeks in its second motion, requiring Kimmel to do, or refrain from doing, things he is already contractually obligated to do or not do, results in no harm to Kimmel.

### D.    Public Interest

As for the last factor, I conclude that granting Lothamer the requested injunctive relief would serve the public interest. The public interest in protecting trade secrets and confidential information, as well as in enforcing valid employment-related contracts, weighs in favor of issuing the preliminary injunction. *See Henkel Corp. v. Cox*, 386 F. Supp. 2d 898, 904 (E.D. Mich. 2005).

### E.       Balancing the Factors

In consideration of the foregoing analysis, I conclude that the balance of the preliminary injunction factors weighs in favor of granting injunctive relief. I recommend that the Court order that the trade secret information Kimmel possesses be deposited in digital format with a neutral third party for preservation.

### F.       Time for Objections

In the normal course, parties have 14 days to file objections to a magistrate judge's report and recommendation. 28 U.S.C. § 636(b)(1)(C). However, the time period may be shortened where exigencies exist. *Aubrey v. Barlin*, No. 1:10-CV-076, 2016 WL 110604, at *3 (W.D. Tex. Jan. 7, 2016) (shortening 14-day objection period to 4 days); *Hispanic Counseling Ctr., Inc. v. Incorporated Village of Hempstead*, 237 F. Supp. 2d 284, 289–90 (E.D.N.Y. 2002) (citing *United States v. Barney*, 568 F.2d 134, 136 (9th Cir. 1978)). In light of Kimmel's serial posts containing confidential information and negative comments in violation of his contractual obligations, I find that exigencies warrant a shortened objection period. Therefore, the parties shall have until August 11, 2025, to file written objections to this Report and Recommendation. Responses shall be due no later than August 14, 2025.

## IV.   Conclusion

For the foregoing reasons, I recommend that Lothamer's motions for preliminary injunction (ECF Nos. 2 and 87) be **GRANTED** as set out above.

Dated: August 6, 2025                                                  /s/ Sally J. Berens
                                                                                SALLY J. BERENS
                                                                                U.S. Magistrate Judge

**NOTICE**

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court by August 11, 2025. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).