UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LOTHAMER TAX RESOLUTION, INC, et al.,

       Plaintiffs,

v.

PAUL KIMMEL,

       Defendant.

_____/

Case No. 1:25-cv-579

Hon. Hala Y. Jarbou


## OPINION

Plaintiffs Lothamer Tax Resolution, Inc., Lothamer Consulting Services, LLC, and Lothamer Franchise Corporation (collectively "Lothamer") bring this lawsuit against a former employee, Defendant Paul Kimmel,[1] alleging (1) violation of the Stored Communications Act (SCA), 18 U.S.C. § 2707(a), (2) violation of the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030(a), (3) violation of the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1839, (4) violation of the Michigan Uniform Trade Secrets Act (MUTSA), Mich. Comp. Laws § 445.1901 *et seq.*, (5) breach of contract, (6) fraud in the inducement of a contract, (7) common-law conversion, and (8) statutory conversion under Mich. Comp. Laws § 600.2919a.  (Compl., ECF No. 1.)

Lothamer moved for a preliminary injunction on May 20, 2025.  (Pls.' Mot. for Prelim. Inj., ECF No. 2.)  On July 24, 2025, due to developments since the start of litigation, Lothamer

---

[1] Kimmel is proceeding pro se.

moved for a temporary restraining order (TRO) and a preliminary injunction. (Pls.' Mot. for TRO, ECF No. 87.)[2]  Lothamer seeks an order to prevent Kimmel from retaining, using, or sharing its confidential information, and to force him to remove a public LinkedIn post about the company. (Pls.' Br. in Supp. of Prelim. Inj. 2, ECF No. 2-1; Pls.' Mot. for TRO Ex. A, ECF No. 87, PageID.1271.)  On August 6, 2025, Magistrate Judge Sally Berens issued a Report and Recommendation ("R&R") recommending that this Court grant Lothamer's motions and issue a preliminary injunction.  (R&R, ECF No. 107.)[3]  Kimmel filed a timely objection to the R&R. (Def.'s Obj., ECF No. 116.)[4]

For the reasons discussed below, the Court will sustain in part and overrule in part Kimmel's objection, adopt in part and reject in part the R&R, grant in part and deny in part Lothamer's motions for a preliminary injunction, and hold in abeyance, pending a hearing, a decision related to the requested preliminary injunction to enforce the contract provision requiring the return of Lothamer's software.

## I. BACKGROUND

The facts as stated in Lothamer's verified complaint are described comprehensively in the R&R, so the Court will only provide a brief overview here. Lothamer is a tax services company

---

[2] Because Kimmel responded, the Court will treat both motions as ones for preliminary injunctions.

[3] Kimmel argues that it was improper for the magistrate judge to consider both motions in one R&R.  However, the rule he cites—Rule 42 of the Federal Rules of Civil Procedure—concerns the consolidation of separate actions, not the combination of two motions into one R&R.  See Fed. R. Civ. P. 42(a)(2).  A magistrate judge can address multiple motions in a single R&R.  See, e.g., Burnett v. Michigan, No. 1:24-CV-57, 2024 WL 3342328 (W.D. Mich. July 8, 2024) (adopting R&R addressing four motions to dismiss).

[4] The magistrate judge required objections to the R&R to be filed within five days, rather than the normal fourteen, concluding that the ongoing harm of Kimmel's actions was an exigency justifying a prompter resolution of the motion. (R&R 20.)  The Court subsequently lengthened the objection period to eleven days, setting August 15, 2025 as the deadline.  Kimmel filed his objection on August 14, 2025.  However, he still objects to the shortened deadline.  (Def.'s Obj. 28.)  Contrary to Kimmel's contentions, a shortened deadline was reasonable given the nature of the motion, and was within the Court's authority.  See, e.g., Harper v. Everson, No. 3:15-CV-00575-JHM, 2016 WL 8201785, at *9 (W.D. Ky. June 27, 2016); Aubrey v. Barlin, No. 1:10-CV-076 DAE, 2016 WL 110604, at *3 (W.D. Tex. Jan. 7, 2016).  Furthermore, given that Kimmel filed extensive objections, any procedural error in establishing the deadline would be harmless.

that hired Kimmel in June 2024 to improve its software.  (Compl. ¶¶ 36, 47, 162, ECF No. 1.)  When he was hired, Kimmel signed an Employment Agreement with three provisions relevant to this case.  First, the non-disclosure provision:

> At no time during and after the term of this Agreement will [Kimmel] communicate or disclose, at any time, to any person, either directly or indirectly, under any circumstances, any confidential knowledge or information acquired by Employee during the period of his[] employment with [Lothamer].  [Kimmel] agrees to take all necessary precautions to prserve the confidentiality of all such information . . .

(Employment Agreement 3, ECF No. 1-3.)  Second, the non-retention provision:

> [Kimmel] will also return all confidential information in his[] possession, or in the possession of others given permission to have such information, upon request or demand by [Lothamer], or within two weeks from the termination date of employment.

(*Id.*)  Finally, the non-disparagement provision:

> [Kimmel] covenants and agrees not to make negative comments about [Lothamer] or its officers, directors, current and former employees, or other agents after he . . . signs this agreement.  Such disparagement includes, but is not limited to, making disparaging or discrediting remarks on any internet web site, including but not limited to, internet complaint boards or social media sites, such as FaceBook, Instagram, X (Twitter), TickTock, UTube, Google Reviews, the Better Business Bureau, any employment sites, etc.

(*Id.* at 5.)

Kimmel also signed a separate Non-Disclosure Agreement ("NDA"), which states:

> [Kimmel] agrees not to use the Confidential Information disclosed to it by Lothamer for use outside of the above stated purpose, or for any unpermitted purpose.  [Kimmel] will not disclose such Confidential Information to anyone, and agrees that [he] will take all reasonable steps to protect the secrecy of and avoid disclosure or use of Confidential Information of Lothamer in order to prevent it from falling into the public domain or the possession of unauthorized persons.

(NDA 1, ECF No. 1-4.)  The NDA defines "Confidential Information" as

> any information, technical data or know-how, including, but not limited to, that which relates to research, customers, software, programming, inventions, processes, designs, drawings, engineering, marketing, trade secrets, pricing, source code, intellectual property, financial statements, any client information, marketing

3

strategies, confidential information legally obtained about competitors, and any other information, disclosed orally or in written or electronic form. Confidential Information does not include information, technical data or know-how which (i) prior or after the time of disclosure becomes part of the public knowledge or literature, not as a result of any inaction or action of Lothamer, (ii) is approved for release by Lothamer, or (iii) is independently developed by Recipient without the use of any Confidential Information of Lothamer.

(*Id.*)

Lothamer was ultimately unsatisfied with Kimmel's work and terminated his employment on March 7, 2025. (Compl. ¶ 120.) On April 6, 2025, Kimmel sent a letter to Jesse Lothamer, the company's majority owner and chief executive officer, about his termination. (*Id.* ¶¶ 11, 126.) Kimmel also sent the letter to several other Lothamer employees. (*Id.* ¶ 134; *see* Kimmel Letter, ECF No. 1-8; Compl. Ex. 11, ECF No. 1-11.) In the letter, Kimmel "formally contest[ed his] wrongful termination" and asked for monetary damages, including a ten percent equity stake equaling $630,000 that was "[b]ased on your own valuation of the company." (Kimmel Letter 1, 3, 6.) Jesse had previously obtained a valuation from an outside company and had not shared the valuation with anyone. (Compl. ¶ 127.) Therefore, Lothamer contends that Kimmel must have learned of the valuation by accessing Jesse's email account without authorization. (*Id.* ¶ 128.) Kimmel, on the other hand, states in a sworn affidavit that he "did not access, attempt to access, or have access to any personal or corporate email accounts belonging to Jesse Lothamer or [Lothamer]." (Kimmel Aff. ¶ 3, ECF No. 70-1.) Lothamer also states that Kimmel maintains unauthorized possession of two software programs belonging to the company—the Scheduled Deposits program, which Kimmel was developing to "automatically populate and track important information," and the company's Portal, which is an online service available to customers. (Compl. ¶¶ 112, 222; Jesse Lothamer Aff. ¶ 7, ECF No. 87-3.)

4

On June 28, 2025, after the commencement of this lawsuit, Kimmel posted an article about Lothamer on LinkedIn.[5]  (LinkedIn Post, ECF No. 87-1.)  In the article, Kimmel criticized Lothamer for having poor data security and provided details about Lothamer's system that, according to Lothamer, are confidential.  (*See id.*; Pls.' Br. in Supp. of TRO, ECF No. 87, PageID.1276.)  Lothamer argues that Kimmel's post significantly increased the number of attempts by bad actors to breach its Portal, which has forced Lothamer to shut down the Portal during nights and weekends.  (Casey Aff. ¶¶ 19-25, ECF No. 87-2; Jesse Aff. ¶¶ 15-23.)

Lothamer's May 20, 2025, motion requests an injunction requiring Kimmel to not use its trade secrets, to return any trade secrets he possesses and destroy any copies, and to identify anyone he disclosed Lothamer's trade secrets to.  (Pls.' Br. in Supp. of Prelim. Inj. 32.)  Lothamer's July 24, 2025, motion additionally requests an injunction requiring Kimmel to take down his June 28, 2025, LinkedIn post, to remove any other public disclosures of Lothamer's confidential information, and to not disclose any other confidential information.  (Pls.' Mot. for TRO, PageID.1271.)

## II. LEGAL STANDARDS

### A. R&R Review Standard

Under Rule 72 of the Federal Rules of Civil Procedure,

> the district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to.  The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

Fed. R. Civ. P. 72(b)(3).

---

[5] Kimmel claims that he removed the post at some point, then republished it on July 24, 2025.  (Def.'s Resp. Br. in Opp'n to TRO 2, ECF No. 88.)

## B. Preliminary Injunction Standard

Whether to issue a preliminary injunction is in the discretion of the district court. *Planet Aid v. City of St. Johns*, 782 F.3d 318, 323 (6th Cir. 2015). A court considers and balances four factors: (1) whether the movant has established a substantial likelihood or probability of success on the merits; (2) whether the movant would suffer irreparable injury without the preliminary injunction; (3) whether the issuance of the preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the preliminary injunction. *Kentucky v. Hagel*, 759 F.3d 588, 600 (6th Cir. 2014). Each factor should "be balanced against one another and should not be considered prerequisites to the grant of a preliminary injunction." *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014). However, the existence of irreparable harm "is indispensable," and district courts abuse their discretion if they grant a preliminary injunction without finding irreparable harm. *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019). Furthermore, "[w]hen one factor is dispositive, a district court need not consider the others." *Id.*

A "preliminary injunction is an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (cleaned up). An injunction at this stage should "only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (internal citation omitted).

"[A] hearing is only required when there are disputed factual issues, and not when the issues are primarily questions of law." *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 552 (6th Cir. 2007). "[W]here material facts are not in dispute . . . district courts generally need not hold an evidentiary hearing." *Id.* (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1312-13 (11th Cir. 1998)). However, "[w]here facts are bitterly

6

contested and credibility determinations must be made to decide whether injunctive relief should issue, an evidentiary hearing must be held" before the court grants injunctive relief. *Tenk*, 511 F.3d at 553.[6]

## III. ANALYSIS

The magistrate judge concluded that Lothamer was likely to prevail on its claims under the SCA, the DTSA, and MUTSA, as well as its breach of contract claims. Kimmel objected to the magistrate judge's recommendation as to each of these claims. Therefore, the Court will consider each claim in turn. *See Mech. Constr. Managers, LLC v. Paschka*, No. 3:21-CV-302, 2022 WL 1591605, at *5 (S.D. Ohio May 19, 2022) (preliminary injunction factors are analyzed separately for separate claims).

As explained below, on the current record Lothamer has not established its right to preliminary relief under the SCA, the DTSA, or MUTSA, or based on breach of the Employment Agreement's non-disclosure provision or breach of the NDA. However, Lothamer has established a right to relief for breach of the Employment Agreement's non-disparagement provision. As to Kimmel's alleged breach of the non-retention provision, the Court finds that there are disputed factual issues that must be addressed in an evidentiary hearing. Therefore, the Court will issue injunctive relief to prevent irreparable harm from breach of the non-disparagement provision and hold an evidentiary hearing to resolve the outstanding factual disputes.

---

[6] Kimmel objected to the magistrate judge's stated preliminary injunction standard (Def.'s Obj 11), and in particular to the principle that "[w]here the three factors other than the likelihood of success all strongly favor issuing the injunction, a district court is within its discretion in issuing a preliminary injunction if the merits present a sufficiently serious question to justify a further investigation." (R&R 6-7 (quoting *Little Caesar Enters., Inc. v. R–J–L Foods, Inc.*, 796 F. Supp. 1026, 1030 (E.D. Mich. 1992)) (alteration in original).) Kimmel contends that this standard was rejected by the Supreme Court in *Winter*, 555 U.S. at 22. Because this Opinion does not rely on the quoted principle, it is unnecessary to decide whether it still applies in light of *Winter*.

**A. SCA Claim**

The SCA provides that whoever "(1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility; and thereby obtains . . . access to a wire or electronic communication while it is in electronic storage in such system shall be punished."  18 U.S.C. § 2701(a).  Electronic storage is defined by the SCA as "(A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (B) any storage of such communication by an electronic communication service for purposes of backup protection of such communication[.]"  *Id.* § 2510(17).  Emails that are stored in a web-based email service are covered under the statute.  *Hately v. Watts*, 917 F.3d 770, 791-98 (4th Cir. 2019).  The SCA provides a private cause of action to "any . . . person aggrieved by any violation of this chapter in which the conduct constituting the violation is engaged in with a knowing or intentional state of mind."  18 U.S.C. § 2707(a).

Lothamer premises its SCA claim on Kimmel's alleged unauthorized access of Jesse's email account.  Therefore, Lothamer must show that (1) Kimmel accessed Jesse's email account; (2) the access was either without authorization or in a manner that exceeded Kimmel's authorization; and (3) the access was intentional.  The magistrate judge concluded that Kimmel's knowledge of the $6.5 million valuation, and his description of it in his letter as "your own valuation," sufficiently established that Kimmel had gained unauthorized access to Kimmel's email.[7]  (R&R 9-10; Kimmel Letter 3.)  Kimmel objects to this conclusion and points to his affidavit, in which he states he never accessed Jesse's emails.  (Pl.'s Obj. 13; Kimmel Aff. ¶ 3.)

---

[7] Kimmel objects that this letter is privileged under the Noerr-Pennington doctrine, which exempts businesses from antitrust liability when they lobby the government.  *Knology, Inc. v. Insight Commc'ns Co.*, 393 F.3d 656, 658 (6th Cir. 2004).  The doctrine is plainly inapplicable to this case.  He also contends that the letter is "protected by pre-

The Court agrees with Kimmel that, based on the evidence in the record, Lothamer has not established a substantial likelihood of success on its SCA claim.  The accusation that Kimmel accessed Jesse's email account is merely an inference from Kimmel's knowledge of the valuation figure.  This circumstantial evidence, standing alone, cannot overcome Kimmel's sworn statement to the contrary.   Kimmel contends that his valuation figure was "inferred from company discussions and public industry benchmarks."  (Def.'s Br. in Opp'n to Prelim. Inj., ECF No. 11, PageID.200.)   Lothamer provides no evidence to refute the entirely plausible suggestion that Kimmel learned about the valuation from his work at the company.

Lothamer has also failed to show irreparable harm related to Kimmel's alleged SCA violation.  Indeed, Lothamer's argument as to irreparable harm focuses on its other claims and does not even mention the company's valuation.  (*See* Pls.' Br. in Supp. of TRO 27-28.)  Lothamer provides no reason to think Kimmel will gain unauthorized access to anyone else's emails, nor does it argue that Kimmel will disclose its valuation figure in the future.  And although Lothamer notes that Kimmel disclosed the valuation to some of its employees (Compl. ¶ 193), it does not contend that this disclosure caused it any harm, let alone that an injunction is necessary to prevent future harm related to the valuation.  Indeed, such a contention would be especially doubtful given that Lothamer included the valuation figure in an exhibit attached to its publicly filed complaint. (*See* Kimmel Letter 6.)

Because Lothamer has failed to show a likelihood of success on the merits of its SCA claim or a likelihood of irreparable harm, it is unnecessary to consider the other two preliminary

---

litigation privilege," which he does not define.  (Def.'s Obj. 13.)  Regardless, any privilege that could have covered the letter was waived when Kimmel sent it to Jesse.

injunction factors.  In sum, Lothamer has not made a clear showing of an entitlement to injunctive relief on its SCA claim.[8]

### B. DTSA and MUTSA Claims

Lothamer also argues that Kimmel has violated the DTSA and MUTSA.  A DTSA claim requires: "(1) 'the existence of a trade secret, defined generally as information with independent economic value that the owner has taken reasonable measures to keep secret[;]' (2) that 'is related to a product or service used in, or intended for use in, interstate or foreign commerce[;]' and (3) 'the misappropriation of that trade secret, defined broadly as the knowing improper acquisition, [] use[,] or disclosure of the secret.'" *In re Island Indus., Inc.*, No. 23-5200, 2024 WL 869858, at *2 (6th Cir. Feb. 29, 2024) (alterations in original) (quoting *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021) (quoting 18 U.S.C. §§ 1836(b)(1), 1839(3), (5))).  A trade secret can be improperly acquired via, among other methods, "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means[.]" 18 U.S.C. § 1839(6)(A).

MUTSA similarly allows a court to enjoin the misappropriation of trade secrets.  Mich. Comp. Laws § 445.1903(1).  "Misappropriation" includes improper acquisition of a trade secret or disclosure of a trade secret that was "acquired under circumstances giving rise to a duty to maintain its secrecy." *Id.* § 445.1902(b).  Improper acquisition includes "theft, bribery, misrepresentation, breach, or inducement of a breach of a duty to maintain secrecy or espionage through electronic or any other means." *Id.* § 445.1902(a).  Because MUTSA and the DTSA have

---

[8] Though Lothamer argued in its motion that it was also entitled to relief under the CFAA, the magistrate judge did not address this claim in her R&R.  Because Lothamer failed to raise any objection to the R&R, the Court need not consider this claim.  However, it will merely note that several of the issues with the SCA claim apply equally to the CFAA, which similarly bars intentional unauthorized access to a computer. *See* 18 U.S.C. § 1030(a)(2).  Lothamer also argues that Kimmel violated the CFAA by threatening to reveal confidential information (i.e., the valuation) with intent to extort. (Pls.' Br. in Supp. of TRO 21; *see* 18 U.S.C. § 1030(a)(7).)  However, Lothamer does not point to any portion of Kimmel's letter that can be read as an extortionate threat.

"almost identical" standards, *Prudential Defense Sols., Inc. v. Graham*, 498 F. Supp. 3d 928, 938 (E.D. Mich. 2020), the Court will address the claims together.

Lothamer argues that Kimmel improperly acquired three trade secrets: the valuation, the Scheduled Deposits Program, and the Portal.  The magistrate judge concluded that Lothamer cannot raise an improper acquisition claim related to the Scheduled Deposits Program or the Portal because Kimmel accessed them as part of his employment—thus, there was no improper acquisition.  (R&R 14-16.)  Lothamer raised no objections to this portion of the R&R, and the Court will adopt the magistrate judge's conclusion on that point.

As to the valuation, Lothamer's argument fails here for the same reason its SCA claims failed.  As discussed above, the record does not clearly establish that Kimmel improperly accessed Jesse's email account.  Therefore, Lothamer is not substantially likely to succeed on its DTSA or MUTSA claims.[9]

Lothamer has also not established a likelihood of irreparable harm related to its DTSA or MUTSA claims.  As discussed above, Lothamer has not shown that Kimmel's access to the valuation figure has caused, or will cause, any harm.  It is unnecessary to consider the other two preliminary injunction factors, as Lothamer has not made a clear showing that it is entitled to injunctive relief.

### C. Breach of Contract Claims

The magistrate judge also concluded that Lothamer was likely to succeed on its breach of contract claims.  As Kimmel notes—and as the magistrate judge acknowledged (R&R 16)—Lothamer referenced Kimmel's alleged breaches of contract in its brief, but did not actually argue

[9] The magistrate judge noted that Lothamer could have brought a claim for improper disclosure of trade secrets under the DTSA based on Kimmel's LinkedIn post.  (R&R 16.)  However, as the magistrate judge explained, Lothamer has not pled or argued that Kimmel violated the DTS or MUTSA in this way.  (*Id.*)  Under those circumstances, it would be inappropriate for the Court to grant relief solely based on the potential success of these hypothetical claims.

11

that they were a basis for injunctive relief.  (Def.'s Obj. 18.)  Kimmel contends, therefore, that he was not properly on notice of these claims.  However, the inclusion of the claims in Lothamer's brief and in the R&R provided Kimmel sufficient notice to address them in his objections, which he did at length.  As explained below, only one of the contract claims—Kimmel's breach of the non-disparagement provision—warrants injunctive relief.

### 1. Disclosure of Valuation

Lothamer alleges that Kimmel revealed its company's valuation to several of its employees when he sent them copies of his letter to Jesse.  This violated his employment agreement, which barred him from "communicat[ing] or disclos[ing] . . . any confidential knowledge or information acquired . . . during the period of his[] employment," (Employment Agreement 3), and the NDA, which barred him from "disclos[ing] . . . Confidential Information to anyone."  (NDA 1.) Lothamer has established that it is likely to succeed on the merits of this claim.  Jesse's affidavit indicates that the valuation figure was confidential, and that Kimmel sent his letter containing the valuation figure to various employees of the company.  The non-disclosure provision and the NDA do not make exceptions for disclosures of confidential information to other employees of the company.  Further, even if Kimmel came up with the valuation figure based in part on company discussions, as he contends, that would still qualify as information obtained "during the period of his[] employment," so revealing that information would be a violation of the contract.

However, Lothamer has not shown irreparable harm as to this claim.  Lothamer has made no argument as to why the letter caused it harm, or why future revelations of its valuation would cause it irreparable harm.  Indeed, though Kimmel revealed the valuation to a small number of company employees, Lothamer subsequently included it in a publicly available court filing. Because Lothamer has not shown any irreparable harm related to this particular contractual breach, it is not entitled to injunctive relief.  *See Sumner*, 942 F.3d at 327 (The existence of irreparable

harm "is indispensable," and district courts abuse their discretion if they grant a preliminary injunction without finding irreparable harm.).

### 2. Confidential Information on LinkedIn

Lothamer also contends that Kimmel disclosed confidential and sensitive information about the company's data security protocols on LinkedIn, exposing Lothamer to attempted security breaches. (Pls.' Br. in Supp. of TRO, PageID.1276.) Specifically, Kimmel mentioned that Lothamer used "PHP 7.3.3" and "SHA-1 Hashing." (LinkedIn Post 2.) Kimmel argues that this information was already made public by Lothamer's court filings. (Pl.'s Obj. 15.) This contention appears correct—in its complaint, Lothamer notes that it uses PHP (Compl. ¶ 196), and one of the documents it attached as an exhibit references its desire to "[r]eplace Dwoo 7.3" (Lothamer Portal Modernization 5, ECF No. 1-7). The complaint also includes Kimmel's letter as an attachment, in which he refers to the company's use of "SHA-1 encryption." (Kimmel Letter 2.)

Lothamer does not argue to the contrary; rather, it contends that including something in a court filing does not expose it to the wider audience of a LinkedIn post. (Pls.' Resp. to Obj. 14, ECF No. 123.) Be that as it may, the relevant question is whether Lothamer's inclusion of the information in a public filing excluded it from the category of confidential information protected by its contracts with Kimmel. The definition of "Confidential Information" in Kimmel's NDA excludes information "approved for release by Lothamer." (NDA 1.) A reasonable interpretation of that phrase includes information that Lothamer put in its public court filings. Kimmel's Employment Agreement does not specifically define "confidential," but the plain meaning of the term does not encompass information that Lothamer made public of its own accord. Therefore, Kimmel did not violate the NDA or the non-disclosure provision of his Employment Agreement.

In sum, Lothamer is unlikely to succeed on the merits of its claim that revealing its software information was a breach of contract, and thus it is not entitled to injunctive relief on this claim.

13

### 3. Retention of Scheduled Deposits Program and Portal

In its verified complaint, Lothamer states that Kimmel maintains unauthorized possession of two software programs belonging to the company—the Scheduled Deposits program and the Portal.  (Compl. ¶ 191.)  Lothamer contends that this conduct is a violation of the non-retention clause of Kimmel's Employment Agreement, which states that Kimmel "will return all confidential information in his/her possession . . . upon request or demand by the Employer, or within two weeks from the termination date of employment."  (Employment Agreement 3.)  Because more than two weeks have elapsed since the end of Kimmel's employment, Lothamer argues, his failure to return these programs is a breach of the contract.  (*See* Compl. ¶ 191.)  The Court agrees, and finds that Lothamer is likely to succeed on the merits of this claim.[10]

However, Lothamer has not established a likelihood of irreparable harm.  Kimmel's LinkedIn post indicates that he has started a competing tax preparation company.  (*See* LinkedIn Post 4 ("I'm building an alternative: CheapTaxSolutions.com.")).  Kimmel does not dispute this fact.  (*See* Def.'s Surreply 3, ECF No. 71 ("Although Defendant has launched a new business, CheapTaxSolutions.com . . . .")).  The magistrate judge concluded that this is sufficient to establish irreparable harm because Kimmel has such an obvious opportunity to use the confidential information he has taken from Lothamer.  (R&R 18.)  Kimmel objects that this is merely "conjecture."  (Def.'s Obj. 27.)  And in a sworn affidavit, Kimmel attests that he has not used Lothamer's confidential information and "[a]ny documents or data in [his] possession were preserved solely for the purpose of litigation."  (Kimmel Aff. ¶ 4.)

---

[10] The magistrate judge also concluded that Kimmel had breached the non-retention provision by keeping the Lothamer Valuation.  (R&R 16.)  However, even if Lothamer is correct that Kimmel learned of the valuation via unauthorized access of Jesse's emails, it is not clear that the valuation is actually an item that can be returned, rather than simply a piece of knowledge.  Regardless, as discussed above, Lothamer has not established any irreparable harm from Kimmel's alleged possession of the valuation.

Lothamer's argument for irreparable harm relies on the assumption that Kimmel will actually use its software for his competing company, which is contradicted by his sworn affidavit. On the record before it, the Court cannot discount Kimmel's affidavit based on Lothamer's speculation. *See Tenke*, 511 F.3d at 553 ("Where facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue, an evidentiary hearing must be held" before the court grants injunctive relief.). Therefore, the Court will hold an evidentiary hearing to resolve this factual dispute.

### 4. Disparagement on LinkedIn

Lothamer also argues that Kimmel violated the non-disparagement provision of his Employment Agreement by making critical statements about the company on LinkedIn.[11]  The relevant portion of the contract provides:

> [Kimmel] covenants and agrees not to make negative comments about [Lothamer] or its officers, directors, current and former employees, or other agents after he . . . signs this agreement. Such disparagement includes, but is not limited to, making disparaging or discrediting remarks on any internet web site, including but not limited to internet complaint boards or social media sites. . . any employment sites, etc.

(Employment Agreement 5.)  The magistrate judge concluded that Kimmel had made disparaging comments about Lothamer in his June 28, 2025, LinkedIn post.  (R&R 17.)  The post contains many negative assertions about Lothamer, including that the company made "false representations" and "unfulfilled oral agreements" (LinkedIn Post 1), that a company officer characterized its "system as the worst code he's seen in 40 years" (*id.* at 2), that Lothamer has had security breaches, that the company is in violation of a federal regulation, that its system is vulnerable to a breach (*id.*), and that the company lied about having attorneys on staff (*id.* at 3).

---

[11] Lothamer also contends that Kimmel disparaged the company by sending a letter to Jesse and various Lothamer employees when he was terminated.  (Pls.' Mot. for Prelim. Inj. 19.)  However, Lothamer does not link this breach of contract to any future irreparable harm, so it is not entitled to relief on this breach of contract claim.

These statements are clearly disparaging, so Lothamer is likely to succeed on the merits of its claim that this post violates the non-disparagement provision.

Lothamer has also sufficiently shown it will suffer irreparable harm from this post. Specifically, Lothamer has established that this post is causing bad actors to attempt to breach its Portal, which in turn has harmed its customers' ability to use the company's services.  (Casey Aff. ¶¶ 19-25; Jesse Lothamer Aff. ¶¶ 15-23.)  These attempts are connected to the breach of the non-disparagement provision, in that Kimmel's claims about Lothamer's security vulnerabilities tacitly encouraged people to try to exploit those vulnerabilities.  And the problems caused by these breach attempts—including the forced shutoffs of the Portal, and the potential reputational harm of a data breach—are likely to irreparably harm Lothamer's business.  *See Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) ("The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute.").

The other preliminary injunction factors also support issuing injunctive relief here.  The Court agrees with the magistrate judge's conclusion that ordering Kimmel to take down this post will not cause substantial harm to Kimmel or others.  (R&R 19.)  Kimmel's right to free speech will only be limited to the extent that he agreed in his employment contract.  And an injunction would be in the public interest because the attempted security breaches caused by Kimmel's post could expose people's information to bad actors.  The public interest is also served by the enforcement of valid employment contracts.  *See Henkel Corp. v. Cox*, 386 F. Supp. 2d 898, 904 (E.D. Mich. 2005).[12]

---

[12] The magistrate judge also concluded that Kimmel violated the non-disparagement clause with another LinkedIn post from July 30, 2025.  (R&R 8.)  But Lothamer has not argued that this post will cause them irreparable harm or requested injunctive relief related to the post, so the Court will not grant any.

Kimmel objects that the magistrate judge's public interest determination did not properly consider the importance of informing the public about Lothamer's alleged security weaknesses. (Def.'s Obj. 21.)  But whatever weaknesses exist in Lothamer's security have been exacerbated by the post, which (inadvertently or not) encouraged bad actors to exploit the company's security vulnerabilities.  Kimmel has not presented evidence establishing that his post was beneficial to the public overall.

In sum, Lothamer has made a clear showing that it is entitled to an injunction requiring Kimmel to remove the June 28, 2025, LinkedIn post.

### 5. First Amendment Objection

Kimmel contends that ordering him to remove his LinkedIn post violates his First Amendment rights and constitutes an unlawful prior restraint.[13]  The magistrate judge concluded that the First Amendment does not apply here because Lothamer is a private party rather than a government actor, and because Kimmel waived his First Amendment rights by signing the Employment Agreement.  (R&R 17 (citing *Romano v. Blue Cross Blue Shield of Mich.*, No. 2:21-cv-12966, 2022 WL 19188, at *3 (E.D. Mich. Jan. 3, 2022); *Ostergren v. Frick*, 856 F. App'x 562, 569–70 (6th Cir. 2021)).)  Kimmel objects that the First Amendment applies because court orders can constitute state action, and that *Ostergren*'s discussion of contractual waiver is inapplicable to these facts.  (Def.'s Obj. 20.)

---

[13] "Any prior restraint on expression comes . . . with a 'heavy presumption' against its constitutional validity." *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971).  "Temporary restraining orders and permanent injunctions— i.e., court orders that actually forbid speech activities—are classic examples of prior restraints." *Alexander v. United States*, 509 U.S. 544, 550 (1993).  Although Kimmel's LinkedIn post is in some sense *past* rather than future speech, an injunction requiring him to remove it is still "prior" in that it forces him to stop an ongoing, continuous act of communication. *See Am. Univ. of Antigua Coll. of Med. v. Woodward*, No. CIV. 10-10978, 2010 WL 5185075, at *3 (E.D. Mich. Dec. 16, 2010) (injunction forcing defendant to take down online speech would constitute prior restraint).

As an initial matter, the application of the state action doctrine to court enforcement of private contracts is not well-settled.  A court's enforcement of tort law, whether through monetary damages or an injunction, implicates the First Amendment even if the parties to the lawsuit are private.  *See, e.g.*, *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 154-55 (1967) (plurality opinion) (applying First Amendment to libel suit for damages brought by private party); *Karhani v. Meijer*, 270 F. Supp. 2d 926, 931-32 (E.D. Mich. 2003) (applying First Amendment to temporary restraining order sought by private party).  A lawsuit brought under a promissory estoppel theory also implicates the First Amendment, because promissory estoppel is "a state-law doctrine which, in the absence of a contract, creates obligations never explicitly assumed by the parties."  *Cohen v. Cowles Media Co.*, 501 U.S. 663, 668 (1991).  This principle implies that enforcement of contractual obligations, by contrast, would not implicate the First Amendment.  However, this inference is not airtight because *Cohen* involved monetary rather than injunctive relief, and First Amendment concerns are heightened in the context of injunctions.  *See Novak v. City of Parma*, 932 F.3d 421, 432 (6th Cir. 2019) ("The First Amendment guarantees 'greater protection from prior restraints.'" (quoting *Alexander v. United States*, 509 U.S. 544, 550 (1993))).

Even so, some courts have held that enforcing a contract via injunction does not implicate the First Amendment at all.  *See United Egg Producers v. Standard Brands, Inc.*, 44 F.3d 940, 943 (11th Cir. 1995) ("Where two disputing parties in positions of equal bargaining power agree, through a Settlement Stipulation, to restrict, in a limited degree, their First Amendment rights on commercial speech as was done here, we hold that court enforcement of that agreement is not governmental action for First Amendment purposes."); *USA Techs., Inc. v. Tirpak*, No. CIV.A. 12-2399, 2012 WL 1889157, at *8 (E.D. Pa. May 24, 2012) ("[I]n the context of a contractual limitation of speech, there is no state action unless the court enjoins speech that is beyond the

18

scope of the parties' agreement."); *Fisher v. Biozone Pharms., Inc.*, No. 12-CV-03716-LB, 2017 WL 1097198, at \*7 (N.D. Cal. Mar. 23, 2017) (granting injunctive relief and holding that a "settlement's non-denigration term does not implicate First Amendment rights").

Other courts have suggested that court enforcement of a contract can constitute state action. *See Nat'l Abortion Fed'n, NAF v. Ctr. for Med. Progress*, 685 F. App'x 623, 626 (9th Cir. 2017) (considering First Amendment challenge to injunction enforcing non-disclosure agreement); *Pizza Hut LLC v. Pandya*, No. 4:19-CV-00726-RWS, 2019 WL 8331437, at \*4 (E.D. Tex. Nov. 26, 2019) (noting, in analysis of TRO request to enforce non-disparagement clause, that "prior restraints against speech are generally unconstitutional"); *Head Kandy LLC v. McNeill*, No. 23-CV-60345-RAR, 2023 WL 7318907, at \*4 (S.D. Fla. Nov. 7, 2023) (considering First Amendment challenge to injunction enforcing non-disparagement agreement); *see also Shelley v. Kraemer*, 334 U.S. 1, 19-20 (1948) (court enforcement of private racially restrictive covenants constitutes state action).  And at least one federal court of appeals has explicitly left the question open.  *See Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 673 F.3d 192, 204-05 (3d Cir. 2012) (declining to decide whether enforcement of a consent decree between private parties constitutes state action).

There does not appear to be any authority from the Sixth Circuit directly indicating how the state action doctrine applies to court enforcement of private contracts.  In two cases, the Sixth Circuit has conducted a First Amendment analysis of the *government's* ability to enforce a contract against a private party by bringing a lawsuit, *see Ostergren*, 856 F. App'x at 568-70; *Henley v. Cuyahoga Cnty. Bd. of Mental Retardation & Dev. Disabilities*, 141 F. App'x 437, 445-46 (6th Cir. 2005), but those opinions indicate little about how the state action doctrine applies to contracts not involving the government.

It is ultimately unnecessary to decide this issue because the Court is persuaded that issuing an injunction here complies with the First Amendment even if it constitutes state action.  Courts have frequently held that it is constitutional to enjoin parties from violating speech-related contractual obligations that they have voluntarily undertaken.  *See, e.g.*, *NAF*, 685 F. App'x at 626 (upholding injunction against violation of non-disclosure contract because "the district court did not clearly err in finding that the defendants waived any First Amendment rights to disclose that information publicly by knowingly signing the agreements"); *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, 679 F. App'x 33, 36 (2d Cir. 2017) (holding that injunction complies with First Amendment because its "prohibition on speech that is false . . . or disparaging effectively enforces defendants' own covenant not to engage in such speech"); *Head Kandy*, 2023 WL 7318907, at *4 (granting injunctive relief to enforce non-disparagement clause because "a party can waive their free speech rights in the course of an agreement"); *Millennial Plastic Surgery PLLC v. James*, No. 21 CIV. 9590 (ER), 2021 WL 5988322, at *2 n.2, *4 (S.D.N.Y. Dec. 16, 2021) (granting injunctive relief to enforce non-disparagement clause because defendant waived First Amendment rights); *Tirpak*, 2012 WL 1889157, at *1, 10-12 (holding that injunction enforcing non-disparagement contract does not violate First Amendment because defendants waived their rights); *Great Caesars Ghost LLC v. Unachukwu*, No. CV 19-5408, 2020 WL 2394052, at *4-5 (D.N.J. May 12, 2020) (granting injunction requiring defendant to obey non-disparagement clause in prior settlement agreement); *Moreno v. Tringali*, No. CIV. 14-4002 JBS/KMW, 2015 WL 3991161, at *1 (D.N.J. June 30, 2015) (discussing prior preliminary injunction requiring defendant to obey non-disparagement clause).

The Supreme Court has also upheld an injunction enforcing a contract that restricted speech, noting that the defendant had "voluntarily signed the agreement." *Snepp v. United States*,

444 U.S. 507, 508-09 & n.3 (1980).  However, the scope of *Snepp*'s holding is unclear given the national security interests implicated by the case.  *See id.* at 509 n.3 (noting that because the plaintiff worked for the CIA, a prior restraint would have been justified even absent a contractual provision).

There is little Sixth Circuit case law on a person's ability to contractually waive their First Amendment rights.  Lothamer points to *Ostergren*, 856 F. App'x at 568-70, a case that is of limited applicability here.  In *Ostergren*, the plaintiff sought an injunction to prevent state officials from enforcing a non-disclosure agreement against him, arguing that the agreement was an unlawful prior restraint.  *Id.* at 563-65, 568.  The Court of Appeals held that the non-disclosure agreement did not violate the First Amendment, noting that "[s]everal courts—including the Supreme Court and our Circuit—have rejected First Amendment challenges to non-disclosure agreements, all emphasizing that the challenging party voluntarily undertook a duty not to speak."  *Id.* at 568-69.  It also pointed out, as a factor in favor of enforcement, that "it was only by making a contractual promise to maintain confidentiality that [the defendant] was able to access the [confidential] materials."  *Id.* at 570.

But *Ostergren* explicitly recognized that the analysis might be different when a party sought an injunction *enforcing* a non-disclosure agreement.  *Id.* at 569 ("Notably, we do not face a prospective injunction seeking to prohibit [the plaintiff] from sharing the course materials in the future.").  Indeed, the court explained that "[w]e have not identified—nor have the parties identified—any cases holding that a non-disclosure agreement alone (*as opposed to an injunction enforcing one*) amounts to a prior restraint."  *Id.* (emphasis added).[14]

---

[14] Lothamer argues that if "[a] non-disclosure agreement itself is not an unlawful prior restraint . . . *a fortiori*, an order that enforces such an agreement is also not an unlawful prior restraint."  (Pls. Resp. to Obj. 18.)  But this gets it exactly backwards: the prior restraint doctrine is specifically concerned with the unique nature of injunctive relief, so an injunction to enforce a non-disclosure agreement implicates the doctrine more than the mere existence of such a

Another potentially relevant case is *Henley*, where the Court of Appeals held that a settlement agreement including a non-disclosure and non-disparagement clause did not violate the First Amendment because the plaintiff had "voluntarily relinquished" her free speech rights.  141 F. App'x at 446.  However, *Henley* involved an order to enforce a settlement—i.e., to prevent the plaintiff from reopening the case, *see id.* at 441—rather than an injunction requiring compliance with the speech-related contractual provisions.   Therefore, it is unclear whether *Henley*'s discussion of waiver is applicable in this context, where the concerns about prior restraints are heightened.

The Sixth Circuit also made some passing comments on this issue in *State Farm Mutual Automobile Insurance Co. v. Angelo*, 95 F.4th 419 (6th Cir. 2024), *cert. denied*, 145 S. Ct. 264 (2024).  There, the defendant challenged on First Amendment grounds a court order requiring him to dismiss a separate lawsuit, which he had brought in violation of a settlement agreement.  *State Farm*, 95 F.4th at 424-25.  The Sixth Circuit did not address the merits of the defendant's argument because it held that he had forfeited the issue.  *Id.* at 435-36.  But the court noted, in dicta, that the defendant was not certain to succeed on his First Amendment claim because "our case law establishes that a party's First Amendment rights are not violated where that party voluntarily enters into a bargained-for agreement that happens to implicate some burden on speech."  *Id.* at 436 (citing *Ostergren*, 856 F. App'x at 569).  Although this principle was not determinative to the outcome, it suggests that the logic of *Ostergren*—and the rule allowing contractual waiver of First Amendment rights—applies in the context of injunctions.

---

contract.  *See Novak*, 932 F.3d at 432 ("The First Amendment guarantees 'greater protection from prior restraints'" (quoting *Alexander*, 509 U.S. at 550).).

Ultimately, the Court is persuaded that enforcement of the non-disparagement clause against Kimmel will not violate his First Amendment rights.  The precedent outlined above largely supports the principle that a person can waive their free speech rights via contract, including their right to not face prior restraints from a court.  *Accord Perricone v. Perricone*, 972 A.2d 666, 679 (Conn. 2009) ("[O]ur research has not revealed[] a single case in which a court has held that a judicial restraining order that enforces an agreement restricting speech between private parties constitutes a per se violation of the first amendment's prohibition on prior restraints on speech."); *Kneebinding, Inc. v. Howell*, 201 A.3d 326, 348 (Vt. 2018) ("[P]rivate parties may enter agreements that waive their respective free speech rights, and courts may enforce those agreements").  That principle is also in line with the general rule that constitutional rights, including First Amendment rights, can be waived.  *See Cohen*, 501 U.S. at 665 (allowing damages for breach of promise of confidentiality because "any restrictions that may be placed on the publication of truthful information are self-imposed"); *Democratic Nat'l Comm.*, 673 F.3d at 204-05 (upholding validity of contract restricting speech because "[t]he Supreme Court has long recognized that a party may waive constitutional rights" (internal quotation marks omitted)); *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 930 (2018) (non-union members who agree to pay union fees "are waiving their First Amendment rights" to free association); *Powell v. SEC*, No. 24-1899, 2025 WL 2233792, at *6 (9th Cir. Aug. 6, 2025) ("Judicially enforceable non-disclosure and non-disparagement agreements are commonplace."); *Lake James Community Volunteer Fire Dept., Inc. v. Burke*, 149 F.3d 277, 278 (4th Cir. 1998) (finding contractual waiver of First Amendment right to petition government), *cert. denied*, 525 U.S. 1106 (1999); *Perricone*, 972 A.2d at 679 n.18 (collecting cases).

Courts that have allowed the waiver of First Amendment rights via contract have generally required it to be knowing, voluntary, and intelligent.  *See Leonard v. Clark*, 12 F.3d 885, 889-90 (9th Cir. 1993), *as amended* (Mar. 8, 1994); *Erie Telecommunications, Inc. v. City of Erie, Pa.*, 853 F.2d 1084, 1094-96 (3d Cir. 1988); *Lake James*, 149 F.3d at 280; *see also D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 187 (1972) (suggesting that waivers of constitutional rights are generally valid if voluntary, knowing, and intelligent).  Some courts have also held that a waiver is invalid "if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement."  *Leonard*, 12 F.3d at 890; *see Lake James*, 149 F.3d at 280 ("The contractual waiver of a constitutional right must . . . not undermine the relevant public interest in order to be enforceable."); *Town of Newton v. Rumery*, 480 U.S. 386, 392 (1987) (applying the public interest requirement to a waiver of a right to sue); *but see Erie Telecomm.*, 853 F.2d at 1099 (declining to conduct a public interest analysis before enforcement of First Amendment waiver).

At this stage, it appears Kimmel's waiver of his First Amendment rights under his Employment Agreement was knowing, voluntary, and intelligent.  The record makes it clear that Kimmel signed the Employment Agreement, and he makes no allegations of coercion or duress. *See Nat'l Abortion Fed'n v. Ctr. for Med. Progress*, No. 15-CV-03522-WHO, 2016 WL 454082, at *18 (N.D. Cal. Feb. 5, 2016), *aff'd sub nom. Nat'l Abortion Fed'n, NAF v. Ctr. for Med. Progress*, 685 F. App'x 623 (9th Cir. 2017) (waiver of First Amendment rights was valid because contracts were "voluntarily and knowingly signed"); *K.M.C. Co. v. Irving Tr. Co.*, 757 F.2d 752, 758 (6th Cir. 1985) ("[I]n the context of an express contractual waiver [of constitutional rights,] the objecting party should have the burden of demonstrating that its consent to the provisions was not knowing and voluntary.").  Although Kimmel objects that the contract was the result of fraud

24

(Def.'s Obj. 12), he has provided no evidence of this.  Enforcing the waiver is also not contrary to the public interest.  Though Kimmel's post arguably informs Lothamer's customers about potential security vulnerabilities affecting their personal information, by advertising those vulnerabilities it also encourages the very breaches Kimmel is warning about.  Therefore, the non-disparagement provision of the Employment Agreement is enforceable.

### 6. Other Objections

Kimmel raises several other objections to the issuance of an injunction.  As explained below, they are all meritless.

Kimmel challenges the enforceability of the Employment Agreement in various ways.  He claims that it was "procured by a fraudulent inducement" and "lacks mutual assent" (Def.'s Obj 12), but he does not point to any evidence supporting these assertions.  He also argues that the agreement is "void as a matter of public policy," but does not explain why this is the case. [15]  (*Id.*)

Kimmel also argues that Lothamer cannot seek an injunction because it has unclean hands. (*Id.* at 15.)  "The concept of unclean hands may be employed by a court to deny injunctive relief where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party." *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1383 (6th Cir. 1995).  The misconduct alleged "must also have a sufficient connection to the matter in dispute." *FBB IP LLC v. Big Boy Rest. Grp., LLC*, 769 F. Supp. 3d 765, 775 (S.D. Ohio 2025) (citing *Cyber Sols. Int'l, LLC v. Pro Mktg. Sales, Inc.*, 634 F. App'x 557, 568 (6th Cir. 2016)).  Kimmel alleges that Lothamer has violated a federal regulation related to data security (Def.'s Obj 16-17), but this is

---

[15] Kimmel also raises several challenges to the enforcement of the NDA, but the Court is not issuing an injunction based on violations of the NDA, so it will not address its enforceability here.

not sufficiently connected to Lothamer's causes of action to support an unclean hands defense, *see Cyber Sols. Int'l*, 634 F. App'x at 568 (unclean hands doctrine "does not grant courts free-floating authority to deny . . . relief in all cases in which a party has engaged in misconduct").

Additionally, Kimmel contends that his LinkedIn post contained only true information, which, he argues, does not qualify as "disparagement as a matter of law." (Def.'s Obj. 19.) However, his Employment Agreement bars him from making any "negative comments about [Lothamer]," regardless of their truth. (Employment Agreement 5.) Therefore, negative but true comments clearly violate the contract.

Kimmel also argues that Lothamer is not entitled to injunctive relief because it "did not seek a TRO until months after termination and only after public criticism on LinkedIn." (Def.'s Obj. 22.) As the Sixth Circuit has explained, "a lengthy delay in seeking injunctive relief may weigh against a finding of irreparable harm," but "[a]ll delays in seeking injunctive relief are not unreasonable." *York Risk Servs. Grp., Inc. v. Couture*, 787 F. App'x 301, 309 (6th Cir. 2019). As to the non-disparagement claims, Lothamer moved for a preliminary injunction on July 24, 2025, less than a month after Kimmel's June 28, 2025, LinkedIn post. (*See* Pls.' Mot. for TRO; LinkedIn Post 1.) This is not an unreasonable delay. *See York*, 787 F. App'x at 309 (six-month delay not unreasonable). As to Lothamer's contract claim for retention of its programs, Lothamer moved for a preliminary injunction requiring the return of its confidential materials on May 20, 2025 (Pls.' Mot. for Prelim. Inj. 32), less than three months after Kimmel was terminated (*see* Compl. ¶ 120). Again, this delay was not unreasonable, especially because it is unclear when Lothamer determined that Kimmel had possession of its programs and was starting a competing business.

Finally, Kimmel argues that the Court should reject the R&R and deny the request for a preliminary injunction due to "a recurring pattern of procedural error" that "deprived [Kimmel] of

26

a fair and reliable adjudication." (Def.'s Obj. 29.)  The Court is not persuaded that any such procedural errors have occurred, let alone that they have deprived Kimmel of a fair and reliable adjudication.

### 7. Citation Practices

Before concluding, it is necessary to address one other issue raised by the briefings.  The Court's review of Kimmel's objection to the R&R indicates that a substantial amount of the legal authority he purports to rely on is either mischaracterized or entirely fictitious.  Many of the cases Kimmel cites cannot be found at the locations he provides.  (*See* Def.'s Obj. 6 n.2 (citation to *Hall v. Hall,* 584 U.S. 147 (2018)), 8 & n.3 (citation to *Baker Hughes Inc. v. S&S Chem., LLC,* No. 2:21-cv-2611, 2022 WL 1591563 (W.D. Tenn. Mar. 30, 2022) and *PFK Co. v. Protective Technologies, Inc.*, 624 F. Supp. 2d 802 (S.D. Ind. 2008)), 13 (citation to *Dearborn Heights v. Comcast*, 269 F. Supp. 3d 904 (E.D. Mich. 2017)), 29 (citations to *Brown v. Matthews Mortuary, Inc.*, 118 F.3d 1008 (4th Cir. 1997) and *United States SEC v. Miner*, 744 F.3d 1123 (9th Cir. 2014)), 12 (citation to *Stinnie v Holcomb,* 977 F.3d 403 (4th Cir. 2020)).)  Other cases do not contain the quoted language he attributes to them.  (*See id.* at 14 (citation to *FormFactor, Inc. v. Micro-Probe, Inc.*, No. 10-3095, 2012 WL 2061520, at *4 (N.D. Cal. June 7, 2012)), 16 & n.3 (citation to *Shane Grp. v. Blue Cross,* 825 F.3d 299, 305 (6th Cir. 2016) and *Next Payment Sols., Inc. v. CLEAResult Consulting, Inc.,* No. 2:17-CV-00628-JRG, 2020 WL 2836778, at *3 (E.D. Tex. May 29, 2020)), 17 (citation to *Mertik v. Blalock*, 983 F.2d 1353, 1367 (6th Cir. 1993)), 18 (citation to *Ball v. Famiglio,* 396 F. App'x 836, 837 (3d Cir. 2010)), 19 (citation to *Rondigo, LLC v. Twp. of Richmond*, 641 F.3d 673, 681 (6th Cir. 2011)), 20 (citation to *Craig v. Harney,* 331 U.S. 367, 374 (1947)), 22 (citation to *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 579 (6th Cir. 2002)), 24 (citation to *Gates Rubber Co. v. Banda Chem. Indus., Ltd.,* 9 F.3d 823, 848 (l0th

Cir. 1993) and *Packaging Corp. of Am. v. Croner*, 419 F. Supp. 3d 1059, 1066 (N.D. Ill. 2020)), 26 (citation to *Basicomputer,* 973 F.2d at 511 (6th Cir. 1992)).)

The Court presumes that the fictitious citations in Kimmel's brief were the result of using generative artificial intelligence ("AI").  "It is no secret that generative AI programs are known to 'hallucinate' nonexistent cases, and with the advent of AI, courts have seen a rash of cases in which both counsel and pro se litigants have cited such fake, hallucinated cases in their briefs."  *Evans v. Robertson*, No. 24-13435, 2025 WL 1483449, at *2 (E.D. Mich. May 21, 2025).  "Without question, it is improper and unacceptable for litigants—including pro se litigants—to submit 'non-existent judicial opinions with fake quotes and citations.'"  *Anonymous v. N.Y.C. Dep't of Educ.*, No. 1:24-cv-04232, 2024 WL 3460049, at *7 (S.D.N.Y. July 18, 2024) (internal quotation marks omitted).  Such fake citations waste the time and resources of the Court and opposing parties. *Morgan v. Cmty. Against Violence*, No. 23-CV-353-WPJ/JMR, 2023 WL 6976510, at *8 (D.N.M. Oct. 23, 2023).  "Sanctions may be imposed for submitting false and nonexistent legal authority to the Court."  *Anonymous*, 2024 WL 3460049, at *7.

Because Kimmel may not have recognized the risks of using AI, the Court will not impose sanctions at this time.  *See Alkuda v. McDonald Hopkins Co.*, No. 1:24-CV-1103, 2025 WL 843403, at *5 n.5 (N.D. Ohio Mar. 18, 2025).  However, Kimmel is now on notice that future use of fictitious citations may result in sanctions.

## IV. CONCLUSION

For the reasons discussed above, Lothamer has established that it is entitled to injunctive relief in relation to Kimmel's breach of the non-disparagement clause of his Employment Agreement.  Therefore, the court will enter an order requiring him to take down the June 28, 2025, LinkedIn post.  As to Kimmel's alleged breach of the non-retention clause, the court will hold an

evidentiary hearing to resolve disputed issues of fact.  Lothamer's other requests for injunctive relief are denied.

An order consistent with this Opinion will issue.


Dated: August 29, 2025                      /s/ Hala Y. Jarbou
                                            HALA Y. JARBOU
                                            CHIEF UNITED STATES DISTRICT JUDGE