UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LOTHAMER TAX RESOLUTION, INC., et al.,

           Plaintiffs,                                 Hon. Hala Y. Jarbou

v.                                              Case No. 1:25-cv-579

PAUL KIMMEL, et al.,

           Defendants.

_____/

## REPORT AND RECOMMENDATION

Plaintiffs (collectively Lothamer) have sued former Lothamer employee Paul Kimmel alleging federal-law claims that he violated: (1) the Stored Communications Act (SCA), 18 U.S.C. § 2707(a); (2) the Computer Fraud & Abuse Act (CFAA), 18 U.S.C. § 1030(a); and (3) the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1839. Lothamer also invokes the Court's supplemental jurisdiction, asserting state-law claims that Kimmel: (1) violated the Michigan Uniform Trade Secrets Act (MUTSA), Mich. Comp. Laws § 445.1901; (2) breached his Employment Contract and Non-Disclosure Agreement with Lothamer; (3) committed fraud in the inducement; and (4) committed common-law and statutory conversion. In response, Kimmel asserts a number of counterclaims, including: (1) termination in violation of public policy; (2) retaliation in violation of the Whistleblowers' Protection Act (WPA), Mich. Comp. Laws § 15.361 *et seq.*; (3) fraudulent inducement; (4) fraudulent performance/constructive fraud; (5) promissory estoppel; (6) statutory conversion; (7) abuse of process; (8) violation of the False Claims Act's (FCA) anti-retaliation provision, 31 U.S.C. § 3730(h)(1); (9) defamation; (10) false light invasion of privacy; and (11) intentional infliction of emotional distress (IIED). (ECF No. 125 at PageID.1679–1719.)

Presently before me are Kimmel's Rule 12(b)(6) Motions to Dismiss (ECF Nos. 44 and 118) and Lothamer's Rule 12(b)(6) Motion to Partially Dismiss Kimmel's Second Amended Counterclaims. (ECF No. 131.) Pursuant to 28 U.S.C. § 636(b)(1)(B), I recommend that the Court **GRANT** Kimmel's Motion to Dismiss as to Counts 2–4 and 6–8 and as to the non-disparagement and disclosure-of-Lothamer-Valuation portions of the breach of contract claim in Count 5 of Lothamer's complaint and **DENY** the motion as to Count 1 (SCA claim) and the failure-to-return portion of Count 5 (breach of contract). I also recommend that the Court **DENY AS MOOT** Kimmel's separate motion regarding the DTSA claim. (ECF No. 118.) Last, I recommend that the Court **GRANT** Lothamer's motion for partial dismissal and dismiss Counts I, II, IV, V, and VII– XI of Kimmel's second amended counterclaims.

## I.  Motion Standard

A Rule 12(b)(6) motion to dismiss for failure to state a claim on which relief may be granted tests the legal sufficiency of a complaint by evaluating its assertions in a light most favorable to Plaintiff to determine whether it states a valid claim for relief. *See In re NM Holdings Co., LLC*, 622 F.3d 613, 618 (6th Cir. 2010). Pursuant to Federal Rule of Civil Procedure 12(b)(6), a claim must be dismissed for failure to state a claim on which relief may be granted unless the "[f]actual allegations [are] enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007). As the Supreme Court has held, to survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009). This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the complaint simply pleads facts that are "merely consistent with" a

2

defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* As the Court further observed, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678-79.

When ruling on a Rule 12(b)(6) motion to dismiss, a district court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008).

## II.  Background[1]

Lothamer provides professional tax services. In 2024, Lothamer decided to upgrade its software capabilities to allow it to intake documents, provide clients a convenient payment method, and schedule payments for clients. (ECF No. 1 at PageID.3.) One of the planned features, "Scheduled Deposits," would provide clients a novel way to pay for Lothamer's services. (*Id.*) Lothamer's previous contractors for the upgrade had failed to produce functioning programs, so Jesse Lothamer, Lothamer's majority owner and chief executive officer, decided to bring the project in-house to provide better access to the project, expedite its completion, and improve its cost management. (*Id.* at PageID.5.)

Lothamer found Kimmel through a staffing agency it had engaged to find a specialist to complete the software update. Kimmel's resume, which stated that he had been a "100% full stack, hands-on architect for 20+ years," indicated that he was particularly experienced and competent in computer engineering and programming. (*Id.* at PageID.6; ECF No. 1-1 at PageID.47.)

---

[1] These facts are taken from Lothamer's verified complaint. Additional facts pertaining to Kimmel's counterclaims will be discussed as necessary in the analysis of Lothamer's motion.

Lothamer's existing software was in computer language known as "PHP," or "PHP: Hypertext Preprocessor." Kimmel told Jesse that he could learn PHP even though he said he worked best in an alternative language known as "C-Sharp" and that he could "program anything." Kimmel knew the position paid a six-figure salary and said that he was seeking compensation of at least $200,000. (ECF No. 1 at PageID.6–7.)

After interviewing Kimmel, Jesse determined that Kimmel was the right candidate for the position and hired him as the in-house leader to complete the Scheduled Deposits program and to perform other updates and maintenance of Lothamer's computer system. (*Id.* at PageID.7–8.) During compensation discussions, Kimmel requested an equity interest in Lothamer for his programming work, but Jesse refused the request. Instead, the parties discussed the possibility of a "royalty" payment for Kimmel's work, but in the end, they agreed to a bonus arrangement pursuant to a written Bonus Agreement effective as of on Kimmel's start date of June 10, 2024. The Bonus Agreement acknowledged that the parties had agreed to the bonus arrangement in lieu of a royalty or any other agreement concerning Kimmel's compensation. (*Id.* at PageID.8–9; ECF No. 1-2.) The parties also executed a binding Employment Agreement:

- requiring Kimmel to return all confidential information to Lothamer upon its request or demand within two weeks from the date his employment was terminated.
- precluding Kimmel from communicating or disclosing to any other person, during or after the term of the agreement, any confidential knowledge of information acquired during his employment with Lothamer.
- precluding Kimmel from disparaging Lothamer, its officers, directors, current and former employees, or other agents, after signing the agreement, on internet complaint boards, social media sites, and employment sites, upon penalty of $1,000 per day that the negative remark remained posted.

(ECF No. 1 at PageID.9; ECF No. 1-3 at PageID.57–59.) Finally, the parties executed a Non-Disclosure Agreement (NDA) which, among other things:

- confirmed that Lothamer was disclosing its confidential information to Kimmel to allow him the ability to serve as Lothamer's Chief Technology Officer (CTO).

- defined "Confidential Information" broadly, including software programming, processes, trade secrets, source code, and intellectual property.
- precluded Kimmel from using "Confidential Information" outside of the stated purpose of serving as Lothamer's CTO or for any unpermitted purposes and from disclosing such information to anyone and required him take all reasonable steps to protect its secrecy and prevent it from falling into the public domain or the possession of unauthorized persons.
- requiring Kimmel promptly to return any materials or documents that Lothamer furnished, including copies, after termination of the employment relationship.

(ECF No. 1 at PageID.11–12; ECF No. 1-4 at PageID.62–63.)

Lothamer alleges that Kimmel initially promised that he would deliver a fully-functioning Scheduled Deposits program by the end of December 2024, which reinforced its belief that Kimmel possessed the knowledge and skill to complete the job. (ECF No. 1 at PageID.15.) Early in his tenure with Lothamer, Kimmel learned of the prior CTO's opinion that the portal project was unsalvageable and that the existing code was "absolutely the worst code" he had ever seen. (ECF No. 1-6.) Kimmel declared that this view was "[t]oo much doom and gloom." (*Id.*) During the remainder of 2024 and into January of 2025, Kimmel maintained that Lothamer need not rewrite its code but instead should perform upgrades, even in response to Lothamer's lay inquiries whether the portal, and particularly the Scheduled Deposits program, needed to be rewritten. (ECF No. 1 at PageID.14–15; ECF No. 1-5 at PageID.10.) Kimmel failed to complete the Scheduled Deposits program by the end of 2024, and in January 2025, after Lothamer began to question why it should continue to pay Kimmel and his team when they had produced no results, Kimmel presented a new plan and timeline, along with "Milestones and Objectives." (ECF No. 1-7 at PageID.90.) Notwithstanding this new schedule, Kimmel failed to complete all the "Milestones and Objectives" he created. (ECF No. 1 at PageID.15.)

Lothamer alleges that despite his representations that he would learn PHP code, Kimmel began to unilaterally replace the portal's PHP code with C-Sharp code, which caused system errors

and interfered with other Lothamer employees' work functions. (*Id.* at PageID.16.) It further alleges that despite its requests for monthly meetings with Kimmel to review his progress on updates and maintenance, Kimmel put off those requests and ignored Jesse's calls. Kimmel finally accepted a meeting to discuss his lack of progress and sent Lothamer a document titled "Year to Date Status for 2025 (from June 2024)." (ECF No. 1-5.)

In early February 2025, Kimmel said that he had an "epiphany" and realized that Lothamer's portal did, in fact, require a rewrite because the existing code was "brittle." (*Id.* at PageID.19.) Kimmel said that he needed six months to secure the portal and that the complete rewrite would take at least 18 months. (*Id.*) Shortly thereafter, Kimmel changed his mind and determined he could begin a rewrite immediately, instead of in six months. (*Id.* at PageID.20.) At some point in February, Jesse met with Kimmel and told Kimmel that he planned to terminate him. Kimmel appeared surprised and said that he planned to finish the project by the following week. Jesse acquiesced, but instead of giving Kimmel one week, gave him three weeks to finish the project. Even after four weeks, however, Kimmel failed to produce anything that was usable. (*Id.* at PageID.21.) Instead, Kimmel produced a one-page document that was incapable of doing anything. (*Id.* at PageID.21–22; ECF No. 1-9.)

On March 7, 2025, Jesse terminated Kimmel's employment. About a month later, in response to the termination, Kimmel sent Lothamer a demand letter accusing it of violating various regulations and laws in the course of its business and asserting that Lothamer committed unlawful acts in connection with Kimmel's employment, including violating the Michigan Whistleblower Protection Act. (ECF No. 1-8.) In his damage summary requesting a 10% equity interest, Kimmel calculated its value at $630,000, "based on a $6.3M company valuation." (*Id.* at PageID.97.) Lothamer alleges that, prior to this time, Jesse had engaged an outside company to value Lothamer

(Lothamer Valuation) and had not shared the information with anyone. (ECF No. 1 at PageID.23.) Lothamer alleges that Kimmel never had authorization to access, view, or download Jesse's personal email account, where the valuation was stored. (*Id.* at PageID.24.)

## III.    Analysis

### A.    Kimmel's Motion to Dismiss

#### 1.    SCA Claim

In Count I, Lothamer alleges that Kimmel obtained Jesse's valuation of Lothamer by accessing Jesse's email accounts without authorization. An individual violates the SCA if he or she does either of the following: "(1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system." 18 U.S.C. § 2701(a). "[E]lectronic storage" is "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof . . . and . . . any storage of such communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. § 2510(17). In addition, "[e]mails—whether read or unread—that are stored in a web-based email service are covered under the statute." *Mitchell, Lewis & Staver, Co. v. Valley Farms Supply, LLC*, No. 1:21-cv-555, 2025 WL 703778, at *3 n.3 (W.D. Mich. Mar. 5, 2025) (citing *Hately v. Watts*, 917 F.3d 770, 791–98 (4th Cir. 2019)). To succeed on its SCA claim, Lothamer must show that: (1) Kimmel accessed Jesse's personal email account; (2) Kimmel did so either without authorization or in a manner that exceeded his authorization; and (3) Kimmel's unauthorized access must have been intentional. *Id.* at *3.

Lothamer alleges that Kimmel confirmed his access to the Lothamer Valuation—which was kept in Jesse's personal email account and not shared with anyone—in his demand letter when he referred to "your own valuation of the company . . . ." (ECF No. 1 at PageID.23, 25.) Lothamer also alleges that Kimmel accessed Jesse's email without authorization because he never had permission to access Jesse's email account, and that such access was intentional. (*Id.* at PageID.26.)

Kimmel argues that Lothamer fails to state an SCA claim because its allegations are too vague and conclusory. He contends that Lothamer fails to allege how the access occurred, which email account(s) was accessed, and whether Kimmel had possession of the necessary credentials to access the account. (ECF No. 45 at PageID.700.) Kimmel further argues that Lothamer fails to provide any details about the security measures in place for the email accounts to show whether they were protected through passwords or encryption or easily hackable. (*Id.*)

Kimmel's arguments lack merit, as he fails to cite any portion of the statue or case law requiring a plaintiff to allege such details. *See Lazette v. Kulmatycki*, 949 F. Supp. 2d 748, 755 (N.D. Ohio 2013) (rejecting the defendants' assertion that "use of a password somehow is an element which a SCA plaintiff must prove"). As set forth above, Lothamer alleges facts supporting the essential elements of its SCA claim. No more is required at this point. Although Kimmel contends that he arrived at his valuation from other sources, this is a factual issue that may be addressed in discovery. In addition, although the Court found in its August 29, 2025 Opinion that Lothamer failed to demonstrate a likelihood of success on its SCA claim (ECF No. 128 at PageID.1814), the standard here—requiring only that Lothamer allege a plausible claim—is more lenient.

8

### 2.    CFAA Claim

In Count 2, Lothamer alleges a claim under the CFAA, 18 U.S.C. § 1030. This claim, like the SCA claim, is based on Kimmel allegedly obtaining the Lothamer Valuation from Jesse's personal email account. "The CFAA prohibits accessing data one is not authorized to access." *Royal Truck & Trailer Sales & Serv., Inc. v. Kraft*, 974 F.3d 756, 760 (6th Cir. 2020). Lothamer premises its claim on Section 1030(a)(7)(B), which requires a plaintiff to demonstrate that that the defendant, (1) "with intent to extort from any person any money or other thing of value;" (2) transmitted in interstate or foreign commerce any communication; (3) threatening to "to impair the confidentiality of information obtained from a protected computer without authorization or by exceeding authorized access." The CFAA, although criminal in nature, provides a private right of action that imposes civil liability if "the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i)." 18 U.S.C. § 1030(g). Lothamer relies on the factor set forth in Section 1030(c)(4)(A)(i)(I), "loss to 1 or more persons during any 1-year period . . . aggregating at least \$5,000 in value." (ECF No. 1 at PageID.27.)

Kimmel asserts that this claim is conclusory and lacks the required factual specificity to plausibly demonstrate a threat of extortion. Kimmel further contends that the claim fails because Lothamer fails plausibly to allege how his access to Jesse's email account could have occurred. (ECF No. 45 at PageID.701.)

I conclude that the CFAA claim fails for two reasons. First, as to the extortion requirement, Lothamer relies solely on Kimmel's April 6, 2025 demand letter (ECF No. 1-8) to satisfy the "intent to extort" requirement. (ECF No. 1 at PageID.27.) As the Court observed in its August 29, 2025 Opinion (ECF No. 128 at PageID.1815 n.8), nothing in the demand letter indicates that it was an extortionate threat. In fact, the letter threatens litigation, not disclosure of compromising information or an accusation of an offense for pecuniary gain akin to blackmail. The Sixth Circuit

9

has held that a threat of litigation, even based on an allegedly fraudulent contract, does not constitute extortion. *Vemco, Inc. v. Camardella*, 23 F.3d 129, 134 (6th Cir. 1994); *see also Edelson PC v. Bandas Lar Firm PC*, No. 16 C 11057, 2018 WL 723287, at *5 (N.D. Ill. Feb. 6, 2018) (noting "the overwhelming weight of authority from other circuits, as well as from courts within this district, supports Defendants' position that bringing or threatening to bring wrongful litigation in order to extract money from the target of the litigation does not amount to a RICO predicate act of criminal extortion"). Second, the CFAA claim is subject to dismissal because, for purposes of Section 1030(c)(4)(A)(i)(I), Lothamer fails to allege loss as defined by the CFAA. Loss includes "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). The Sixth Circuit has observed that the CFAA's loss and damage provisions "confirm the Act's narrow scope." *Kraft*, 974 F.3d at 760. Specifically, those provisions are "aimed at preventing the typical consequences of hacking, rather than the misuse of corporate information . . . ." *Id.* Here, Lothamer alleges that it "suffered a loss of at least $300,000" since the beginning of Kimmel's employment through the date of the complaint, which appears to concern the salary and benefits Lothamer paid to Kimmel for his work (ECF No. 1 at PageID.38), as opposed to costs incurred to remediate any damage to its system or to restore lost data, or damages arising from interruption in service as a result of Kimmel's alleged unauthorized access to Jesse's personal email. Therefore, I recommend that this claim be dismissed.

### 3.    DTSA and MUTSA Claims

Lothamer alleges claims for violation of the DTSA and MUTSA in Counts 3 and 4 of its complaint. The standards of DTSA and MUTSA "are almost identical." *Prudential Defense Sols., Inc. v. Graham*, 498 F. Supp. 3d 928, 938 (E.D. Mich. 2020).

To establish a claim under the DTSA, a plaintiff must show: "(1) 'the existence of a trade secret, defined generally as information with independent economic value that the owner has taken reasonable measures to keep secret[;]' (2) that 'is related to a product or service used in, or intended for use in, interstate or foreign commerce[;]' and (3) 'the misappropriation of that trade secret, defined broadly as the knowing improper acquisition, [ ] use[,] or disclosure of the secret.'" *Sigma Corp. v. Island Indus., Inc.* (*In re Island Indus., Inc.*), No. 23-5200, 2024 WL 869858, at *2 (6th Cir. Feb. 29, 2024) (quoting *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021) (quoting 18 U.S.C. §§ 1836(b)(1), 1839(3), (5))). A defendant may acquire a trade secret by "improper means" through "bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means," but not by "lawful means of acquisition." 18 U.S.C. § 1839(6). MUTSA provides a statutory cause of action and remedies for misappropriation of trade secrets. Mich. Comp. Laws. §§ 445.1903, 1904. Misappropriation includes improper acquisition of a trade secret or disclosure of a trade secret that was "acquired under circumstances giving rise to a duty to maintain its secrecy." *Id.* § 445.1902(b). Improper acquisition includes "theft, bribery, misrepresentation, breach, or inducement of a breach of a duty to maintain secrecy or espionage through electronic or any other means." *Id.* § 445.1902(a).

Kimmel contends that Lothamer's DTSA and MUTSA claims fail for a number of reasons, including that Lothamer has failed to allege sufficient facts showing that the Scheduled Deposits Program, the portal, and the Lothamer Valuation constitute information that may be protected as a trade secret. (ECF No. 45 at PageID.701–06.) For the reasons set forth in the August 6, 2025

11

Report and Recommendation, Lothamer's claims fail as to the Scheduled Deposits program and the portal, regardless of their trade secret status, because Kimmel acquired them though proper means in the course of his employment as Lothamer's CTO. (ECF No. 107 at PageID.1517–19.) There is thus no need to determine whether Lothamer has plausibly alleged that these items are trade secrets. Lothamer's claims fail because the complaint alleges no other theory of liability with regard to the Scheduled Deposit Program and the portal.

As for the Lothamer Valuation, Kimmel argues that it does not qualify as a trade secret because it is simply someone's opinion of the value of the Lothamer companies, and Lothamer fails to establish that the valuation had independent economic value. Under the DTSA, a trade secret may consist of

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing[.]

18 U.S.C. § 1839(3). It must "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]" *Id.* § 1839(3)(B). Finally, information will be protected as a trade secret only if the owner "has taken reasonable measures to keep such information secret[.]" *Id.* § 1839(3)(A). MUTSA defines "trade secret" as follows:

> (d) "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that is both of the following:
>
> (*i*) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

12

(*ii*) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

Mich. Comp. Laws § 445.1902(d). In Michigan, a "'trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.'" *Hayes–Albion v. Kuberski*, 421 Mich. 170, 181 (1984) (quoting Restatement of Torts § 757, cmt. b).

Kimmel argues persuasively that Lothamer fails to plead sufficient facts plausibly to allege that the Lothamer Valuation has independent economic value for use in its business. In its complaint, Lothamer groups the Scheduled Deposits Program, the portal, and the Lothamer Valuation together, alleging that they have economic value because they "increase[s] (*a*) efficiency, (*b*) accuracy, (*c*) ease of use, and (*d*) franchise opportunities." (ECF No. 1 at PageID.29.) Clearly, the valuation itself does not increase Lothamer's or its clients' efficiency, accuracy, or ease of use. To the extent Lothamer claims that the valuation increases "franchise opportunities," such information cannot qualify as a trade secret because franchising, by its very nature, requires disclosure of the financial information underlying the valuation, which in turn would allow individuals outside of Lothamer to easily calculate its valuation under various methods. *See* 16 C.F.R. Part 436; https://www.ftc.gov/business-guidance/blog/2023/05/franchise-fundamentals-taking-deep-dive-franchise-disclosure-document (last visited Oct. 13, 2025). Moreover, I have found no case under the DTSA or MUTSA holding that a valuation, by itself, qualifies as a trade secret.

Accordingly, I recommend that the DTSA and MUTSA claims be dismissed. If the Court adopts this recommendation, Kimmel's separate motion pertaining to the DTSA claim (ECF No. 118) may be dismissed as moot.

### 4.    Breach of Contract

Lothamer's breach of contract claim in Count 5 has two aspects. First, it alleges that Kimmel breached the non-disparagement provision of the Employment Contract by publishing two remarks on his LinkedIn account. Lothamer further alleges that Kimmel breached the non-disparagement provision by sending his demand letter to Lothamer's employees. (ECF No. 1 at PageID.33–35.) Second, Lothamer alleges that Kimmel breached the Employment Contract by failing to return confidential information timely—the Scheduled Deposits Program and the portal. It also alleges that Kimmel breached the NDA by disclosing the Lothamer Valuation to Lothamer's employees via his demand letter. (*Id.* at PageID.35–36.) To establish a claim for breach of contract, a plaintiff must show: (1) the existence of a valid and enforceable contract between the parties; (2) the terms of the contract; (3) that the defendant breached the contract; and (4) that the plaintiff suffered an injury as a result of the breach. *Timmis v. Sulzer Intermedics, Inc.*, 157 F. Supp. 2d 775, 777 (E.D. Mich. 2001) (citing *Webster v. Edward D. Jones & Co.*, 197 F.3d 815, 819 (6th Cir. 1999)).

### a.    Non-Disparagement Provision

The Employment Agreement contains the following provision:

> Employee covenants and agrees not to make negative comments about the Employer or its officers, directors, current and former employees, or other agents after he or she signs this agreement. Such disparagement includes, but is not limited to, making disparaging or discrediting remarks on any internet web site, including but not limited to internet complaint boards or social media sites, such as FaceBook, Instagram, X (Twitter), TickTock, UTube, Google Reviews, the Better Business Bureau, any employment sites, etc.

(ECF No. 1-3 at PageID.59.) The Employment Agreement stipulated that Kimmel "agrees to pay [Lothamer] the amount of $1,000 per day for every day that such negative remark remains posted."

Lothamer contends that Kimmel violated this provision by posting the following on his LinkedIn account on April 21, 2025:

> All of this palaver about emotional Intelligence, team work, culture, ego is mostly useless nonsense. Most of that really won't make your work friends your friends. It won't keep you from getting laid off or abused by a boss that thinks at-will means you're his personal servant.
>
> Be yourself. Be true to yourself. Make your way the best way you know how. Be competent. Be decent. Be honest and fair. Don't be a dope or a sap.
>
> If you['v]e got the goods get an employment contract. At will gives employers too much power. Most of all. You are not your khakis. Enjoy your life.

(*Id.* at PageID.33–34; ECF No. 1-10 at PageID.103.) It further alleges that Kimmel breached the provision by posting the following on his LinkedIn account on April 29, 2025:

> It's time to end the lopsided abuses of employment in America. At-will employment cedes way too much power to employers and leaves every employee susceptible.
>
> It's time to end the indignity of uncertainty. Call or write your state and federal congressman and tell them employees should have some degree of basic safeguards.
>
> This country is supposed to be of the people and by the people and for the people. Health insurance is damn near useless. Pensions are a thing of the past, resulting in people working cradle to grave. And at-will employment is disgraceful.
>
> Capitalism doesn't mean we have to concede all power to greed. Everything has to have limits, even the pursuit of profit.

(ECF No. 1 at PageID.34; ECF No. 1-10 at PageID.101.) Lothamer alleges that these comments referred to Lothamer because Kimmel posted them while he still listed Lothamer as his employer on his LinkedIn profile. (ECF No. 1 at PageID.35.)

Kimmel contends that these statements fail to support a breach of the non-disparagement provision because they fail to mention Lothamer, tax resolution, or any specifics about Lothamer's operations, and are simply broad generalizations about the state of employment practices and

15

capitalism rather than disparaging remarks targeting Lothamer or its tax services. Kimmel further contends that his statements are protected by the First Amendment. (ECF No. 45 at PageID.707.)

The Court previously discussed Kimmel's First Amendment concerns in its August 29, 2025 Opinion. (ECF No. 128 at PageID.1822–30.) Nonetheless, I find that Kimmel's posts cannot reasonably be construed as violating the non-disparagement provision. The subject provision defines disparagement ("[s]uch disparagement"), as "negative comments about the Employer or its officers, directors, current and former employees, or other agents[.]" (ECF No. 1-3 at PageID.59.) Neither post expressly refers to Lothamer or its officers, directors, employees or agents, nor do they do so by implication. Rather, the statements appear to be Kimmel's advice to others and his general views on the state of employment under the United States' current economic system. I find that, even considering Kimmel's reference to Lothamer as his current employer in his LinkedIn profile, no reasonable juror could conclude that these posts disparaged or discredited Lothamer directly or indirectly. Therefore, I recommend that the Court dismiss this portion of the breach of contract claim.

As for Kimmel's demand letter, I find that it falls within the scope of the non-disparagement provision because it makes negative comments about Kimmel and/or its officers and directors. Moreover, the provision does not limit its application to disparaging or discrediting remarks posted online. Nonetheless, to state a valid breach of contract claim, Lothamer must also allege that it suffered an injury as a result of the breach. Lothamer fails to allege injury resulting from Kimmel sending the demand letter to Lothamer employees. The "$1,000 per day" penalty provision applies only to remarks that "remain[] posted." However, Lothamer does not allege that Kimmel posted the letter online or anywhere else. Therefore, this aspect of the claim should be dismissed as well.

16

**b.    Failure to Return/Non-Disclosure**

Lothamer alleges that Kimmel violated the Employment Agreement by failing to return confidential information to Lothamer within two weeks from the date his employment was terminated. The Employment Agreement provides:

> Employee also will return all confidential information in his/her possession, or in the possession of others given permission to have such information, upon request or demand by the Employer, or within two weeks from the termination date of employment.

(ECF No. 1-3 at PageID.57.) Lothamer alleges that Kimmel's failure to return the Scheduled Deposits program and the portal, which qualify as confidential information, breached the agreement. (ECF No. 1 at PageID.36.) Lothamer further alleges that Kimmel violated the NDA, which provides:

> Recipient agrees not to use the Confidential Information disclosed to it by Lothamer for use outside of the above stated purpose, or for any unpermitted purpose. Recipient will not disclose such Confidential Information to anyone, and agrees that it will take all reasonable steps to protect the secrecy of and avoid disclosure or use of Confidential Information of Lothamer in order to prevent it from falling into the public domain or the possession of unauthorized persons. Recipient agrees to notify Lothamer in writing of any misuse or misappropriation of Confidential Information that may come to its attention.

(ECF No. 1-4 at PageID.62.) Lothamer claims that Kimmel breached this provision by sharing information from the Lothamer Valuation with people not authorized to have that information when he sent his demand letter to Lothamer employees. (ECF No. 1 at PageID.36.)

The Court has already determined that Lothamer is likely to succeed on its breach of contract claim concerning Kimmel's retention of the Scheduled Deposits program and the portal contrary to his obligations under the Employment Agreement. (ECF Nos. 128 at PageID.1819 and 145 at PageID.1939 (finding that Kimmel retained the Scheduled Deposits program and the portal for more than two weeks following the end of his employment with Lothamer and that the digital

17

files on his personal computer qualify as "documents" and "information" for purposes of the relevant provision).

As for Lothamer's claim that Kimmel violated the NDA by sharing information from the Lothamer Valuation with Lothamer Employees, I recommend that the Court dismiss this claim because, according to Lothamer's own allegations, Kimmel's alleged dissemination of that information did not violate the NDA. Even if the Lothamer Valuation constitutes "confidential information" under the NDA, Kimmel's non-disclosure obligation extended only to information "disclosed to [him] by Lothamer" for the purpose of allowing Kimmel to serve as Lothamer's CTO. Lothamer alleges that Kimmel accessed the Lothamer Valuation without permission and was never authorized to possess or use it. Thus, Kimmel's dissemination of that information could not have breached the NDA because the valuation was not information subject to the non-disclosure provision of the NDA.

### 5.    Fraud in the Inducement

In Count 6, Lothamer alleges that Kimmel's false statements induced it to hire him as its CTO. "A fraud in the inducement occurs when the defendant materially misrepresents its future conduct, reasonably expects the plaintiff to rely on the misrepresentation, and the plaintiff does rely on the misrepresentation by taking a detrimental action the plaintiff would not otherwise have taken." *IF Props., L.L.C. v. Macatawa Bank Corp.*, No. 307554, 2012 WL 4799310, at *2 (Mich. Ct. App. Oct. 9, 2012) (per curiam). The elements of fraud in the inducement are generally the same as those for common-law fraud. *Oraha v. Troy Motors, Inc.*, No. 358183, 2022 WL 3330152, at *3 (Mich. Ct. App. Aug. 11, 2022) (per curiam) (citing *Custom Data Sols., Inc. v Preferred Capital, Inc.*, 274 Mich. App. 239, 243 (2006)). "The difference between the two claims is that, while common-law fraud relates to misrepresentations of past or existing fact, fraud in the

18

inducement 'occurs where a party materially misrepresents future conduct under circumstances in which the assertions may reasonably be expected to be relied upon and are relied upon.'" *Id.* (quoting *Custom Data Sols.*, 274 Mich. App. at 242-243 (quotation marks omitted)).

Lothamer alleges that Kimmel's statements "that he could '*program anything*' and that he could learn PHP" constitute material representations that Kimmel made to induce Lothamer to pay him an exorbitant amount of money, and that Lothamer relied on those statements by hiring him for the position of CTO, for which he was "wholly unqualified." (ECF No. 1 at PageID.37 (italics in original).) Lothamer alleges that these statements were false because Kimmel was never able to program the Scheduled Deposits program or the portal upgrade, was unable to perform the portal maintenance, and he refused or could not learn to use PHP. (*Id.*) Kimmel contends that Lothamer's claim fails because it does not comply with Rule 9(b)'s particularity requirement, Lothamer had the opportunity to ascertain Kimmel's abilities and background, and the alleged statements were non-actionable "puffery" rather than statements of fact. (ECF No. 45 at PageID.709–10.)

Regardless of whether Lothamer's claim complies with Rule 9(b), I find that it fails for other reasons. First, Kimmel's alleged statements that he "*could* program anything" and "*could* learn PHP" are not statements about future conduct required to support a fraud-in-the-inducement claim. Rather, they are statements concerning Kimmel's present computer programming abilities. In other words, Kimmel was not making representations about his future performance. Moreover, if Lothamer had concerns about, or had wanted to confirm, Kimmel's programming background or abilities, it could have inquired with his prior employers such as Hillsdale College, or his references, assuming it had asked for them. Lothamer does not allege that Kimmel interfered with or blocked its access to these sources. *See Nieves v. Bell Indus., Inc.*, 204 Mich. App. 459, 464

19

(1994) ("There can be no fraud where a person has the means to determine that a representation is not true.").

Finally, Kimmel's alleged statements constitute statements of opinion or so-called "puffing" rather than actionable statements of positive fact. *See Kheder Homes at Charleston Park, Inc. v. Charlston Park Singh, LLC*, No. 307207, 2014 WL 60326, at *5 (Mich. Ct. App. Jan. 2, 2014). As explained in *Hayes Construction Co. v. Silverthorn*, 343 Mich. 421 (1955):

> So far as Johnson's assertions as to the merits of the Coleman furnace, that it would do the job, that it was miserly in its consumption of fuel, and the maintenance nil, we are here in the realm of what the common law has for years termed 'puffing,' a salesman's praise of his own property, involving matters of estimate or judgment upon which reasonable men may differ. Ordinarily these are not regarded as actionable, even though the vendee's joys of realization fail short of those of his anticipation. The reason for this lies in the realities of commercial intercourse.

*Id.* at 426. Here, while Kimmel was not selling a physical product, he was selling his abilities. Like the salesman in *Hayes Construction*, Kimmel's praise of his own talents—that he could program anything or learn a new type of code—was simply "puffing" that does not constitution actionable fraud. Therefore, I recommend that this claim be dismissed.

### 6.     Common-Law and Statutory Conversion

Counts 7 and 8 assert claims for common-law conversion and statutory conversion under Mich. Comp. Laws § 600.2919a. "Conversion is any distinct act of dominion wrongfully exerted over another's personal property." *Trail Clinic, P.C. v. Bloch*, 114 Mich. App. 700, 705 (1982). To maintain a claim for statutory conversion, a plaintiff must establish the elements of common-law conversion and show that the defendant converted "the property in question for his 'own use.'" *McCrea v. Blue Star Motel*, No. 1:21-cv-270, 2022 WL 708737, at *2 (W.D. Mich. Jan. 27, 2022), *report and recommendation adopted*, 2022 WL 593588 (W.D. Mich. Feb. 28, 2022) (citing *Aroma Wines & Equip., Inc. v. Columbian Distrib. Servs., Inc.*, 497 Mich. 337, 353–57 (2015)). As to

both claims, Lothamer alleges that Kimmel converted the Scheduled Deposits program, the portal, and the Lothamer Valuation. (ECF No. 1 at PageID.38–42.)

Lothamer's conversion claims fail because Lothamer fails to allege that the Scheduled Deposits program, the portal, and the Lothamer Valuation constitute property that may be converted. For purposes of conversion, whether common-law or statutory, Michigan courts define property as "tangible property, as well as certain intangible property where a plaintiff's ownership interest is represented by, or connected to, something tangible." *Axle of Dearborn, Inc. v. Detroit IT, LLC*, No. 21-cv-10163, 2023 WL 3437803, at *15 (E.D. Mich. May 12, 2023) (citing *American Furukawa, Inc. v. Hossain*, 103 F. Supp. 3d 864, 884 (E.D. Mich. 2015)). For example, the Michigan Supreme Court has observed that in cases in which an intangible interest, such a lien, lease, deed, or mortgage, was converted, the conversion involved something tangible representing the intangible interest, such as the document creating the interest. *Alisa A. Peskin-Shepherd, PLLC v. Blume*, 974 N.W.2d 835, 836 n.4 (2022).

First, the Lothamer Valuation is simply a number. Lothamer alleges only that Kimmel accessed Jesse's email and obtained that number. The complaint does not allege that Kimmel took a document, such as a report containing the valuation, that would constitute tangible property. Perhaps Kimmel memorized the number or wrote it down on a piece of paper, but that does not constitute conversion of tangible property or conversion of intangible property connected to something tangible. Once known, Kimmel could not dispossess himself of the valuation by returning it to Lothamer. Therefore, the conversion claim fails as to the valuation.

As for the Scheduled Deposits program and the portal, they are nothing more than software or computer code that is intangible property. Lothamer does not allege that Kimmel possessed the Scheduled Deposits program or the portal connected to something tangible owned by Lothamer,

21

such as a CD-ROM, a physical server, or an external hard drive. Rather, Kimmel possessed these programs on his own personal computer. *See Axle of Dearborn*, 2023 WL 3437803, at *16 (dismissing the plaintiff's conversion claim concerning computer network and systems and accounts due to the plaintiff's failure to connect the intangible property to tangible property). Therefore, because the Scheduled Deposits program and portal do not constitute property that could be converted, I recommend that the conversion claims be dismissed.

## B.    Lothamer's Motion for Partial Dismissal

Lothamer moves to dismiss Kimmel's second amended counterclaims except for fraudulent inducement and statutory conversion. Kimmel alleges the following background facts.[2]

Lothamer represented to Kimmel during the recruitment process that it maintained "mature, secure, and compliant" operations and systems supporting national tax resolution services. Kimmel stopped pursuing other professional opportunities based on these assurances. (ECF No. 125 at PageID.1682.) Kimmel alleges that, contrary to these assurances, Lothamer's systems contained substantial vulnerabilities that created unauthorized access risks. (*Id.*) Kimmel cites, for instance, a May 31, 2024 internal email confirming that Jesse was informed of a security breach involving theft and exploitation of Mailgun credentials. He alleges that, instead of reporting the breach as required by applicable law, Jesse instructed his staff to keep the matter "internal." (*Id.* at PageID.1683.) Kimmel alleges that Lothamer engaged in other concerning practices,

---

[2] Kimmel complains that Lothamer's motion fails to comply with Rule 7(b)(1)(B)'s requirement that a motion "state with particularity the grounds for seeking the order" because it incorporates by reference arguments raised in ECF No. 64, which in turn incorporates previous arguments that Lothamer raised in its motion to partially dismiss Kimmel's first amended counterclaims, ECF No. 48. (ECF No. 133 at PageID.1870.) To the extent Kimmel contends that Lothamer's incorporation of its prior arguments render its current motion defective, his argument is meritless. Exercising my inherent judicial discretion, I permitted Lothamer to incorporate by reference its arguments raised in ECF No. 64, which in turn refers to ECF No. 48. (ECF No. 112.) Allowing Lothamer to do this promotes judicial economy and efficiency and in no way prejudices Kimmel.

including unauthorized alteration of client electronic signatures, improper billing practices, and misrepresentations regarding attorney oversight. Kimmel alleges that he raised these concerns with Lothamer COO Brian Lorencen, and that Kimmel was prepared to raise these concerns to external regulators and authorities, but within days of his reports to Lorencen, Lothamer terminated his employment and dismantled the IT department. (*Id.*)

### 1.    Wrongful Termination in Violation of Public Policy, Whistleblower Retaliation, and False Claims Act Retaliation (Counts I, II, and VIII)

In Count I, Kimmel alleges that Lothamer terminated him in violation of public policy. In Count II, he alleges that Lothamer retaliated against him in violation of the Michigan Whistleblower's Protection Act (WPA), Mich. Comp. Laws. § 15.362. Finally, in Count VIII, Kimmel alleges a claim for violation of the anti-retaliation provision of the False Claims Act (FCA), 31 U.S.C. § 3730(h)(1). As to his FCA claim, Kimmel alleges that during his employment with Lothamer, a company officer informed him that Lothamer had laid off staff during the same period for which it had received federal funds under the Paycheck Protection Program (PPP). (ECF No. 125 at PageID.1706.) Kimmel alleges that based on this information, he investigated and determined that Lothamer had, in fact, received a PPP loan and confirmed "that staff reductions may have violated the terms of the federal loan certification." (*Id.*) He alleges that he "did not immediately confront Jesse Lothamer with these findings," but "was terminated shortly thereafter." (*Id.*) Kimmel claims that "[t]he timing and surrounding circumstances indicate that [Lothamer's] decision was retaliatory and intended to suppress further inquiry or potential whistleblower action." (*Id.*)

Lothamer initially moved for dismissal of each of these claims as they were pled in Kimmel's first amended counterclaims on a number of grounds. (ECF No. 48 at PageID.774–77, 784–86.) In its present motion, Lothamer moves for dismissal on more limited grounds. As to all

three claims, it contends that Kimmel cannot establish the requisite causal link between his protected activity and his termination. (ECF No. 64 at PageID.937–38, 940.)

Michigan courts recognize a public policy exception to the general rule that, in the absence of a contractual provision to the contrary, an employee's employment is terminable at will. *Suchodolski v. Michigan Consolidated Gas Co.*, 412 Mich. 692, 694–96 (1982). This exception applies under circumstances that include an employee's failure or refusal to violate the law in the course of his employment. *Id.* at 695. To state a claim for termination in violation of public policy, a plaintiff must establish causation. That is, the plaintiff must show that his participation in the protected activity was a "significant factor" in his termination, "not just that there was a causal link between the two events." *Maksimuk v. Ed Rinke Chevrolet Co.*, No. 251895, 2005 WL 1224689, at *2 (Mich. Ct. App. May 24, 2005) (citing *Barrett v. Kirtland Cmt'y Coll.*, 245 Mich. App 306, 315 (2001)). Temporal proximity, alone, is insufficient to show a causal connection between the protected activity and the adverse employment action. *Derderian v. Genesys Health Care Sys.*, 263 Mich. App. 364, 385–86 (2004) (citing *West v. General Motors Corp.*, 469 Mich. 177, 186 (2003)).

Protected activity under the WPA includes: (1) reporting to a public body a violation of a law, regulation, or rule; (2) being about to report such a violation to a public body; or (3) being asked by a public body to participate in an investigation. *Chandler v. Dowell Schlumberger Inc.*, 456 Mich. 395, 399 (1998). A plaintiff asserting a WPA claim must show that (1) he engaged in protected activity as defined by the act, (2) the defendant discharged him, and (3) a causal connection exists between the protected activity and the discharge. *Smith v. Gentiva Health Servs. (USA) Inc.*, 296 F. Supp. 2d 758, 762 (E.D. Mich. 2003) (citing *Chandler*, 456 Mich. at 399). In addition, "an employer is entitled to objective notice of a report or a threat to report by the

whistleblower." *Kaufman & Payton, P.C. v. Nikkila*, 200 Mich. App. 250, 257 (1993). Finally, as with a public policy-type claim, a plaintiff must show "something more than a temporal connection between protected conduct and an adverse employment action." *Cooney v. Bob Evans Farms, Inc.*, 645 F. Supp. 2d 620, 631 (E.D. Mich. 2009), *aff'd*, 395 F. App'x 176 (6th Cir. 2010).

Regarding the FCA, to state a claim for retaliation, a plaintiff must allege that: (1) he engaged in protected activity; (2) his employer knew that he engaged in the protected activity; and (3) his employer discharged or otherwise discriminated against the employee as a result of the protected activity. *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003). "The FCA's legislative history states that the employee must show that 'the retaliation was motivated at least in part by the employee's engaging in protected activity.'" *McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 518 (6th Cir. 2000) (citing S. Rep. No. 99–345, at 35, *reprinted in* 1986 U.S.C.C.A.N. at 5300).

Kimmel's allegations are too conclusory to state plausible claims of termination in violation of public policy and retaliation under the WPA and FCE. First, regarding his public policy claim, Kimmel simply alleges that his termination was a direct result of his objections to statutory violations and his refusal to acquiesce to Lothamer's unlawful practices (ECF No. 125 at PageID.1684), but this is simply a legal conclusion without supporting facts. Although Kimmel does allege that he spoke to COO Brian Lorencen about his concerns and was terminated days later, these allegations provide nothing more than temporal proximity as a basis for a causal link, which, as set forth above, is insufficient to establish the requisite causal connection for a public

policy claim.[3] Absent some other factual allegation suggesting an unlawful intent, the claim fails under the *Twombly/Iqbal* standard.

Next, as to his WPA claim, Kimmel fails to allege any fact showing that he provided "objective notice" to Lothamer's management of his intent to report Lothamer's alleged violations to a relevant public authority. Kimmel alleges that he was *preparing* to report alleged violations and that he internally raised his concerns with Lothamer's COO (ECF No. 125 at PageID.1685–86), but he fails to allege that he actually disclosed this intent to the COO or to anyone else at Lothamer. Moreover, as is the case with his public policy claim, Kimmel's allegations rely on nothing more than temporal proximity, which is insufficient to support his WPA claim.

Finally, Kimmel fails to allege sufficient facts to support his FCA retaliation claim. Although Kimmel alleges that he engaged in protected activity by investigating Lothamer's misuse of PPP funds, he alleges no fact indicating that any decisionmaker at Lothamer knew about his investigation of Lothamer's use of the PPP funds. In fact, Kimmel admits that "he did not immediately confront Jesse Lothamer with these findings," and "was terminated shortly thereafter." (ECF No. 125 at PageID.1706.) Therefore, Kimmel fails to state a plausible FCA retaliation claim.

### 2.  Fraudulent Performance/Constructive Fraud (Count IV)

In Count IV, Kimmel alleges a claim of fraudulent performance/constructive fraud. He alleges that after he accepted employment with Lothamer, Lothamer continued to make material misrepresentations about the company's structure, regulatory standing, and other matters. As examples, Kimmel cites Jesse's promotion of multiple offices nationwide that were actually

---

[3] Although Kimmel argues that the exhibits he attaches to his counter claim support both his public policy and WPA retaliation claims (ECF No. 133 at PageID.1873), they provide no support for the causation element of his claims.

26

empty. Kimmel further alleges that Jesse continued to assure him that he would be granted an equity interest, that the Scheduled Deposits program would be prioritized, and that Kimmel should conduct himself as an equity partner with memorialization of the equity agreement forthcoming. (*Id.* at PageID.1694–95.) Kimmel alleges that these assurances were false, as Lothamer frequently changed priorities. Kimmel claims that he relied on these representations by continuing to perform his job as Lothamer's CTO. (*Id.* at PageID.1695–98.) Kimmel alleges that as a result of Lothamer's misrepresentations, he suffered economic loss, reputational harm, and disruption to his professional trajectory. (*Id.* at PageID.1695.)

As an initial matter, Lothamer asserts that Michigan law does not recognize a cause of action for fraudulent performance. (ECF No. 64 at PageID.938.) Kimmel acknowledges this argument in his response, but fails to cite any Michigan case actually recognizing a theory of fraudulent performance. (ECF No. 133 at PageID.1880.) In any event, my own research confirms Lothamer's assertion that fraudulent performance is not a cognizable tort under Michigan law.

However, Michigan courts do recognize the concept of "constructive fraud." Constructive fraud, as Michigan courts define it, is essentially common-law fraud without the intent element. *See General Elec. Credit Corp. v. Wolverine Ins. Co.*, 420 Mich. 176, 188 (1984) (noting that "constructive fraud . . . only requires a misrepresentation which need not amount to a purposeful design to defraud"). The usual elements of fraud are: "(1) that the charged party made a material representation; (2) that it was false; (3) that when he or she made it he or she knew it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he or she made it with the intention that it should be acted upon by the other party; (5) that the other party acted in reliance upon it; and (6) that the other party thereby suffered injury." *Novi v. Robert Adell Children's Funded Trust*, 473 Mich. 242, 253 n. 8 (2005). "[C]onstructive fraud is merely a term

that 'has been evolved to designate what is essentially nothing more than the receipt and retention of unmerited benefits.'" *International Indus. Contracting Corp. v. Sofir Italia S.R.L.*, No. 16-CV-13168, 2017 WL 3499899, at *4 (E.D. Mich. Aug. 16, 2017) (quoting *Olitkowski v. St. Casimir's Saving & Loan Ass'n*, 302 Mich. 303, 308–09 (1942)).

Kimmel's constructive fraud claim fails for several reasons. First, he fails to show how he was harmed by many of the alleged misrepresentations, such as the number of offices Lothamer actually had and whether they were actually staffed. Second, Kimmel's unfettered access to Lothamer's business information gained after he accepted his employment, as demonstrated by his allegations and claims in this action, shows that he cannot plausibly claim fraud as to many of the alleged misrepresentations he claims Lothamer made after he began his tenure as CTO. *See Nieves*, 204 Mich. App. at 464 ("There can be no fraud where a person has the means to determine that a representation is not true."). Third, to the extent this claim relies on post-employment promises of an equity interest, the claim fails because his reliance upon indefinite and uncertain promises of a future event was unreasonable. (ECF No. 125 at PageID.1697 (citing Jesse's October 2024 statement that equity would be "'memorialized in January [2025] if we still liked each other'").) *See Hi-Way Motor Co. v. International Harvester Co.*, 398 Mich. 330, 336 (1976) (reasonable reliance is an element of fraud). Last, and most importantly, Kimmel alleges neither injury caused by Lothamer's alleged misrepresentations nor Lothamer's receipt of unmerited benefits. Kimmel does not allege, for example, that, even though he continued his employment with Lothamer, he was not paid his negotiated salary or benefits for the work he had agreed to do and that Lothamer expected him to perform.

### 3.    Promissory Estoppel (Count V)

Kimmel alleges that Lothamer is liable under a theory of promissory estoppel. His allegations mirror, somewhat, those of his constructive fraud claim. He alleges that Lothamer made "clear and definite promises" to him, "including a $225,000 salary, a $25,000 signing bonus, equity in the company—not merely on paper—and full autonomy to hire and manage a development team." (ECF No. 125 at PageID.1700.) He claims that these promises were a "substantial factor" in his decision to accept employment with Lothamer and forego other unspecified professional opportunities. (*Id.*) Kimmel attaches as an exhibit to his counterclaims an email to him from Tanner Lauka of Robert Half sent before Kimmel signed the Employment Agreement and accepted employment with Lothamer, stating that Jesse "has agreed to the $225K employee contract, the $25K signing bonus, the equity not just on paper, and the autonomy to hire and run your own team. If you're still interested he would like you to come in at one of the following times . . . ." (ECF No. 125-4 at PageID.1732.) Kimmel alleges that after he began his employment, Jesse continued to affirm the equity promise when he stated in July 2024 that Lothamer would abandon the franchising model in favor of a corporate structure and that Kimmel's equity would be tied directly to Lothamer Tax Resolution, and that Jesse was waiting on his lawyer to formalize the equity agreement. (*Id.*) In October 2024, however, Jesse told Kimmel that the equity commitment would be "memorialized in January [2025] if we still liked each other." (*Id.*) Kimmel alleges that "[t]hese post-contractual assurances were made to induce [Kimmel's] continued loyalty, suppress internal objections, and extract on-going high value contributions." (*Id.*)

In Michigan, a claim for promissory estoppel requires, "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance." *Charter Twp. of Ypsilanti v. Gen.*

*Motors Corp.*, 201 Mich. App. 128, 133 (1993). Courts will enforce such a promise "if injustice can be avoided only by enforcement of the promise." *Id.* "Promissory estoppel requires an actual, clear, and definite promise." *Id.* at 134. "[R]eliance is reasonable only if it is induced by an actual promise." *Id*. (internal citations and quotation marks omitted).

Kimmel fails to state a valid promissory estoppel claim as the promises he alleges were not "actual, clear, and definite" promises. As Kimmel's own allegations show, the issue of an equity interest was not based on a definite and clear promise, but was merely a fluid, speculative, and ongoing discussion in the course of the parties' brief relationship. *See Brissett v. Lansing 53, Inc.*, No. 207525, 1999 WL 33441265, at *2 (Mich. Ct. App. June 11, 1999) (holding that a letter of understanding to negotiate a contract for the sale or purchase of stock if the requirements of the letter were met was not a "clear" promise upon which a promissory estoppel claim could be maintained). Therefore, I recommend that this counterclaim be dismissed.

### 4.      Abuse of Process (Count VII)

Kimmel alleges that Lothamer filed the instant action, not for a legitimate purpose, but to retaliate against Kimmel "for exposing internal misconduct, asserting protected legal rights, and preserving evidence in anticipation of whistleblower and fraud claims." (ECF No. 125 at PageID.1704.) His abuse of process claim lacks merit.

Under Michigan law, an abuse of process claim requires a plaintiff to show: "(1) an ulterior purpose and (2) an act in the use of process which is improper in the regular prosecution of the proceeding." *Friedman v. Dozorc*, 412 Mich. 1, 30 (1981). It is clear under Michigan law that there is no abuse of process claim for causing process to issue. *Id.* n.18 (citing Restatement (Second) of Torts). Rather, an abuse of process claim "lies for the improper use of process after it has been issued, not for maliciously causing it to issue." *Spear v. Pendill*, 164 Mich. 620, 623 (1911)

(internal quotation marks omitted); *see also Garcia v. Thorne*, 520 F. App'x 304, 311 (6th Cir. 2013) ("Garcia's abuse-of-process claim against Thorne fails because Thorne's behavior has to do with the initiation of criminal proceedings, not the misuse of process."). In other words, a valid claim requires "a situation where the defendant has used a proper legal procedure for a purpose collateral to the intended use of that procedure." *Bonner v. Chicago Title Ins. Co.*, 194 Mich. App. 462, 472 (1992).

Here, Kimmel's claim simply focuses on Lothamer's act of causing process to issue. He fails to allege any fact showing improper use of process after it issued. Lothamer's conduct in the course of this litigation that Kimmel cites does not qualify as misuse of that procedure. While Kimmel clearly believes that Lothamer has misused the judicial process by filing the instant lawsuit, his allegations fail to support misuse of process. Therefore, I recommend that this claim be dismissed.

### 5.    Defamation (Count IX)

Kimmel alleges that Jesse made false and defamatory statements regarding Kimmel to third parties, including that Kimmel "lacked proficiency in PHP and failed to produce any meaningful work product in that language during his employment at Lothamer Tax Resolution, Inc." (*Id.* at PageID.1708.) He alleges that Jesse published these statements via email and oral communications to third parties, including Ryan Vartoogian, Jordan Casey, Brian Lorencen, Amy Lothamer, and Tammy Consavage, with the intent to discredit Kimmel's technical competence and diminish his professional standing. Kimmel further alleges that Lothamer demonstrated its malicious intent by stating in its motion for preliminary injunction, "Defendant Paul Kimmel just couldn't let sleeping dogs lie." (*Id.* at PageID.1709.) Kimmel further claims that Lothamer made two defamatory statements in its filings in this action, "[Kimmel] has revealed himself to be a cyber terrorist out

for revenge because [Kimmel's] scheme to extort $2.2 million from Lothamer failed" (*id.* at PageID.1710 (citing ECF No. 90 at PageID.1355)), and "[Kimmel] is a cyber terrorist who is out for revenge[.]" (*Id.* at PageID.1711 (citing ECF No. 92 at PageID.1374).)

The elements of a defamation claim under Michigan law are "(1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication." *Mitan v. Campbell*, 474 Mich. 21, 24 (2005).

Lothamer contends that the defamation is subject to dismiss for several reasons, including that Kimmel fails to allege that Jesse made the statements on behalf of, or within the scope of his employment with, Lothamer. This contention is correct, as Kimmel does not allege that Jesse made these statements in the course of his employment. But even if Kimmel had alleged that Jesse was speaking on behalf of Lothamer, the claim would still fail as to these statements because they are not actionable.

Under Michigan law, a communication is defamatory if it "tends to harm the reputation of a person so as to lower him in the estimation of the community or deter others from associating or dealing with him." *American Transmission, Inc. v. Channel 7 of Detroit, Inc.*, 239 Mich. App. 695, 702 (2000). "To be considered defamatory, statements must assert facts that are 'provable as false.'" *Ghanam v. Does*, 303 Mich. App. 522, 545 (2014) (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990)). A statement of opinion "may be defamatory when it implies assertions of objective facts." *Smith v. Anonymous Joint Enter.*, 487 Mich. 102, 129 (2010). However, "rhetorical hyperbole" or mere exaggerations "that cannot be interpreted as stating actual facts" cannot serve as the basis for a defamation claim. *Ghanam*, 303 Mich. App. at 545–46. "Whether a

communication is capable of bearing a particular meaning is a question of law." *Jolliff v. N.L.R.B.*, 513 F.3d 600, 610 (6th Cir. 2008).

Jesse's statements that Kimmel "lacked proficiency in PHP" and "failed to produce any meaningful work product in that language," fall within the realm of protected opinion rather than assertion of objective fact. Both of these statements imply the speaker's subjective views.[4] Statements about an individual's proficiency in an area or whether work product was "useful"— without an implication of undisclosed facts—cannot support a defamation claim because they are suggestive of nothing more than the speaker's subjective opinion. Here, Jesse's alleged statements are simply those of an employer dissatisfied with the quality of an employee's work. Moreover, "if the statement can be understood both to be objectively verifiable but also to mean different things to different people—in other words, the statement is subjective and therefore open to several plausible interpretations—then the statement is not actionable." *Edwards v. Detroit News, Inc.*, 322 Mich. App. 1, 14 (2017). Thus, even if Kimmel could point to some objective basis to show that he was proficient in PHP coding or that someone would have found his work valuable, the subjective nature of the statements at issue renders them non-actionable. Courts have found similar statements to be nonactionable opinion. *See Manjarres v. Nalco Co.*, No. 09 C 4689, 2010 WL 918072, at *3 (N.D. Ill. Mar. 9, 2010) (finding that, without more, statements that the plaintiff was "unprofessional" and "incompetent" amounted to vague opinions without a readily understood meaning); *Roy v. Coco*, 649 So. 2d 1139, 1141 (La. Ct. App. Feb.1, 1995) (affirming trial court's

---

[4] Contrary to Kimmel's allegation that the alleged statements amount to defamation per se (ECF No. 125 at PageID.1710), under Michigan law, only "words imputing a lack of chastity or the commission of a crime constitute *defamation per se* and are actionable even in the absence of an ability to prove actual or special damages[.]" *Cetera v. Mileto*, 342 Mich. App. 441, 450 (2022) (internal quotation marks omitted). Thus, Kimmel would be required to prove special damages caused by the alleged statements if they were actionable.

finding that statements that the plaintiff was "not qualified to run a bank," "hire[d] incompetent people," and had "poor leadership and management ability" were opinion and, therefore, not defamatory). Finally, Jesse's statement that Kimmel "failed to produce any meaningful work product" is in the nature of "rhetorical hyperbole" or mere exaggeration.

Jesse also has no claim based on the alleged litigation statements. First, although it is not clear whether Kimmel alleges that Lothamer's statement, "Defendant Paul Kimmel just couldn't let sleeping dogs lie," is defamatory, I have previously determined that the phrase is simply "a common colloquialism for the notion that a person could not leave well enough alone[.]" (ECF No. 39 at PageID.654.) This is not defamatory.

More importantly, Kimmel's claims based on statements made during this proceeding are barred by Michigan's judicial proceedings privilege. Michigan has long recognized a broad immunity that protects witnesses, judges, and parties in judicial proceedings from liability based on testimony or other communications made during judicial proceedings. As summarized in *Hartung v. Shaw*, 130 Mich. 177 (1902):

> If statements made in the course of judicial proceedings, in pleadings, or in argument are relevant, material, or pertinent to the issue, their falsity or the malice of their author is not open to inquiry. They are then absolutely privileged. *Hoar v. Wood*, 44 Mass. 193, 197; *Maulsby v. Reifsnider*, 69 Md. 143, 14 Atl. 505; *Moore v. Bank*, 123 N. Y. 420, 25 N. E. 1048, 11 L. R. A. 753; 2 Stevens, Mich. Prac. § 275. It is only necessary that the language be pertinent, or, as some authors say, relevant.

*Id.* at 179; *see also Maiden v. Rozwood*, 461 Mich. 109, 134 (1999) (noting that quasi-judicial immunity extends to witnesses in judicial proceedings and "to those serving in a quasi-judicial adjudicative capacity as well as 'those persons other than judges without whom the judicial process could not function" (quoting 14 West Group's Michigan Practice, Torts, § 9:393, p. 9–131)). "[T]he privilege is liberally construed as a matter of public policy 'so that participants in judicial proceedings may have relative freedom to express themselves without fear of retaliation.'"

34

*Lawrence v. Burdi*, 314 Mich. App. 203, 217 (2016) (quoting *Sanders v. Leeson Air Conditioning Corp.*, 362 Mich. 692, 695 (1961), *abrogated in part on other grounds by Moore v. Michigan Nat'l Bank*, 368 Mich. 71 (1962)).

The statements Kimmel cites were all made in papers filed in this action and were relevant to the matters at hand. For example, the "sleeping dogs lie" comment pertained to Kimmel's $2.2 million demand—unfounded in Lothamer's view—following termination of his employment. Similarly, Lothamer's "cyberterrorist" comments were made in briefing seeking injunctive relief requiring Kimmel to remove postings on his LinkedIn account containing information regarding Lothamer's computer system that, Lothamer asserted, contributed to increased targeted attacks on Lothamer's portal. Lothamer viewed these posts as Kimmel's response to its failure to pay Kimmel's $2.2 million demand. Lothamer's statements were therefore "relevant, material, or pertinent to the issue[s]" presented. *Hartung*, 130 Mich. at 179. Thus, I recommend that the Court dismiss Kimmel's defamation claim.

### 6.    False Light Invasion of Privacy (Count X)

Kimmel alleges a claim of false light invasion of privacy based on Jesse's (or Lothamer's) statements regarding his technical abilities, work product, and professional integrity. He alleges that Jesse made these statements to "third parties," although he does not identify them. (*Id.* at PageID.1712.) Nonetheless, given that this claim is pled as an alternative to the defamation claim, it appears that Kimmel asserts these statements were made to the individuals mentioned in the defamation claim.

"In order to maintain an action for false-light invasion of privacy, a plaintiff must show that the defendant broadcast to the public in general, or to a large number of people, information that was unreasonable and highly objectionable by attributing to the plaintiff characteristics,

conduct, or beliefs that were false and placed the plaintiff in a false position." *Puetz v. Spectrum Health Hosps.*, 324 Mich. App. 51, 69 (2018) (quoting *Duran v. Detroit News, Inc.*, 200 Mich. App. 622, 631–32 (1993)). "Moreover, such publicity must lift the curtain of privacy on a subject matter that a reasonable man of ordinary sensibilities would find offensive and objectionable: supersensitiveness is not protected." *Reed v. Ponton*, 15 Mich. App. 423, 426 (1968) (citing Prosser, Torts (3d ed.), § 112).

This claim fails for at least two reasons. First, the alleged statements about Kimmel's professional abilities and work product did not concern matters of a "personal and private nature" that could be "characterized as being *highly* objectionable." *Cetera*, 342 Mich. App. at 458–59. In *Cetera*, the plaintiffs brought a false light invasion of privacy claim based on the defendant's negative online review complaining about the plaintiffs' business practices, which the plaintiffs considered "defamatory posts." *Id.* at 446. The court found that the defendant's posting concerning the plaintiffs' business practices bore no relationship to the plaintiffs' private lives, as required for a false light claim. *Id.* at 458–59. Thus, the court held "as a matter of law that the postings cannot be characterized as being *highly* objectionable, especially considering that they did not concern anyone's private life." *Id.* at 459. The same is true here. The alleged statements reveal nothing about Kimmel's private life.

This claim also fails because Kimmel does not allege that Lothamer broadcasted the statements to the public in general or to a large number of people. *See Puetz* 324 Mich. App. at 71 (noting that "[t]he term 'broadcast' means 'to make widely known'"). Here, Kimmel alleges that

the statements were communicated only to a small group of individuals (about five), consisting mostly, if not exclusively, of Lothamer employees. Thus, dismissal is warranted.[5]

### 7.    Intentional Infliction of Emotion Distress (Count XI)

Last, Kimmel alleges that Lothamer is liable for the tort of IIED based on Lothamer's:

- false accusation of Kimmel being a "cyber terrorist" in its filings in the present action;

- fabrication of the "Lothamer Valuation," which it cannot produce;

- false claim that Kimmel "could not code PHP;"

- termination of Kimmel and his IT colleagues without cause;

- 235-paragraph complaint "riddled with irrelevant and defamatory matter;" and

- claim that the code Kimmel worked on was intellectual property.

(ECF No. 125 at PageID.1714–17.)

To establish an IIED claim, a plaintiff must allege the following elements: (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress. *Chungag v. Wells Fargo Bank, N.A.*, 489 F. App'x 820, 824–25 (6th Cir. 2012) (citing *Dalley v. Dykema Gossett PLLC*, 287 Mich. App. 296, 321 (2010)). "Liability for the intentional infliction of emotional distress has been found only where the conduct complained of has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Graham v. Ford*, 237 Mich. App. 670, 674 (1999). The test is whether "the recitation of the facts to an average member

---

[5] Kimmel's references in his response to Lothamer's court filings labeling him a "cyber terrorist" as a means to show public disclosure do not suffice to defeat Lothamer's motion on the false light claim. (ECF No. 133 at PageID.1886.) First, Kimmel does not allege those statements as a basis for the claim. Second, the judicial proceedings privilege, discussed above, would preclude any claim based on those statements.

of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594, 603 (1985) (quoting Restatement (Second) of Torts § 46 cmt. d (1948)). "Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Doe v. Mills*, 212 Mich. App. 73, 91 (1995) (citing *Linebaugh v. Sheraton Mich. Corp.*, 198 Mich. App. 335, 342 (1993)). The acts of which Kimmel complains amount to mere insults, annoyances, petty oppressions, and other trivialities that do not meet the high threshold of conduct to support an IIED claim. *See VanVorous v. Burmeister*, 262 Mich. App. 467, 481 (2004), *abrogated on other grounds by Odom v. Wayne Cnty.*, 482 Mich. 459 (2008) ("The threshold for showing extreme and outrageous conduct is high. No cause of action will necessarily lie even where a defendant acts with tortious or even criminal intent."). The acts of which Kimmel complains are neither extreme in degree nor outrageous. Therefore, he fails to state an IIED claim.

## IV.  Conclusion

For the foregoing reasons, I recommend that the Court **GRANT IN PART AND DENY IN PART** Kimmel's motion to dismiss (ECF No. 44) as set forth above. If the Court adopts this recommendation, the case will proceed on Lothamer's SCA claim and its failure-to-return breach of contract claim in Counts 1 and 5 of its complaint. I further recommend that the Court **GRANT** Lothamer's motion partially to dismiss Kimmel's second amended counterclaims. (ECF No. 131.) If the Court adopts this recommendation, the case will proceed on Kimmel's fraudulent inducement and statutory conversion claims set forth in Counts III and VI of his second amended counterclaims.

Dated: October 21, 2025                          /s/ Sally J. Berens
                                                 SALLY J. BERENS
                                                 U.S. Magistrate Judge

38

**NOTICE**

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).