UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LOTHAMER TAX RESOLUTION, INC.,
et al.,

    Plaintiffs,

v.

PAUL KIMMEL,

    Defendant.
_____/

Case No. 1:25-cv-579

Hon. Hala Y. Jarbou

## **AMENDED OPINION**

This case is a trade secrets and contract dispute arising out of the breakdown of the employment relationship between Plaintiffs Lothamer Tax Resolution, Inc., Lothamer Consulting Services, LLC, and Lothamer Franchise Corporation (collectively "Lothamer") and Defendant Paul Kimmel.[1]  Lothamer brings claims for violation of (1) the Stored Communications Act (SCA), 18 U.S.C. § 2707(a), (2) the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030(a), (3) the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1839, and (4) the Michigan Uniform Trade Secrets Act (MUTSA), Mich. Comp. Laws § 445.1901 *et seq.*, and for (5) breach of contract, (6) fraud in the inducement, (7) common-law conversion, and (8) statutory conversion under Mich. Comp. Laws § 600.2919a.  (Compl., ECF No. 1.)  Kimmel brings counterclaims for (1) wrongful termination, (2) retaliation in violation of the Michigan Whistleblowers' Protection Act (WPA), Mich. Comp. Laws § 15.361 *et seq.*, (3) fraudulent inducement, (4) constructive fraud, (5) promissory estoppel, (6) statutory conversion, (7) abuse of process, (8) retaliation in violation

---

[1] This is an amended version of the Court's November 26, 2025, opinion (ECF No. 180), which has been edited to correct the list of dismissed and surviving claims.

of the False Claims Act (FCA), 31 U.S.C. § 3729 *et. seq.*, (9) defamation, (10) false light invasion of privacy, and (11) intentional infliction of emotional distress (IIED). (2d Am. Answer, ECF No. 125.)

Kimmel has moved to dismiss all of Lothamer's claims (*see* ECF Nos. 44, 118); Lothamer has moved to dismiss all of Kimmel's counterclaims except those for fraudulent inducement and conversion (*see* ECF No. 131). Before the Court is Magistrate Judge Sally J. Berens's report and recommendation (R&R) that the Court grant in part and deny in part Kimmel's motion to dismiss and grant Lothamer's motion to dismiss. The magistrate judge recommended that the Court dismiss Lothamer's CFAA, DTSA, MUTSA, fraud, and conversion claims, as well as part of its breach of contract claim (Counts II–IV, part of Count V, and Counts VI–VIII). The magistrate judge also recommended that the Court dismiss Kimmel's wrongful termination, WPA, constructive fraud, promissory estoppel, abuse of process, FCA, defamation, invasion of privacy, and IIED claims (Counts I, II, IV, V, and VII–XI). Lothamer objects to all of the recommended dismissals of its claims except the CFAA claim. (*See* Pls.' Objs., ECF No. 174.) Kimmel objects only to the recommended dismissals of his wrongful termination, WPA, constructive fraud, FCA, and defamation claims. (*See* Def.'s Objs., ECF No. 173.)

For the reasons explained below, the Court will adopt in part and reject in part the R&R, and grant in part and deny in part both motions to dismiss. The Court will also hold in abeyance a portion of Kimmel's motion to dismiss so the parties can submit additional briefing on the issue of federal preemption.

## I. LEGAL STANDARD

Under Rule 72 of the Federal Rules of Civil Procedure,

> the district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject,

or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

Fed. R. Civ. P. 72(b)(3).

## II. ANALYSIS

### A. Lothamer's Claims

#### 1. DTSA and MUTSA

Lothamer's DTSA and MUTSA claims are based on Kimmel's alleged misappropriation of its Scheduled Deposits Program, its client Portal, and its valuation. The magistrate judge recommended that the Court dismiss Lothamer's DTSA and MUTSA claims because (1) Kimmel legitimately acquired the Scheduled Deposits Program and the Portal in the course of his employment, and (2) Lothamer's valuation is not a trade secret. Lothamer objects to both conclusions.

First, Lothamer argues that even if Kimmel gained access to the Scheduled Deposits Program and the Portal as part of his employment, he transferred them to a personal computer without authorization, which constitutes improper acquisition under the DTSA and MUTSA. But Lothamer's complaint does not contain the allegation that Kimmel transferred the Scheduled Deposits Program and the Portal to his own computer without authorization. And though Lothamer's subsequent filings suggest that Kimmel was not authorized to download its software to his computer, Kimmel argues that he initially downloaded the software so he could work from home. If he was allowed to do so, then his acquisition of the software was not unauthorized. Kimmel's argument is not contradicted by any allegation in the complaint; thus, the Court will grant the motion to dismiss Lothamer's DTSA and MUTSA claims regarding the Scheduled Deposits Program and the Portal.

3

Second, Lothamer disagrees with the magistrate judge's conclusion that its valuation is not a trade secret because it lacks independent economic value. Lothamer argues that the valuation it refers to in its complaint is not just a single figure representing the company's value; rather, it is "a comprehensive analysis of *why* a company is valuable, *what* makes a company valuable, and the monetary value of a company." (Pls.' Objs. 4.) However, the complaint says nothing about this additional information; it alleges merely that Kimmel found out the overall figure at which the company was valued. Furthermore, without more detail about the information allegedly included in the valuation, it is impossible to determine whether Lothamer derived economic value from that information. Thus, the Court will dismiss Lothamer's DTSA and MUTSA claims regarding its valuation.

### 2. Breach of Contract

#### (a) Non-Disparagement Provision

Lothamer alleges that Kimmel breached the non-disparagement provision of his employment contract (the "Employment Agreement") by making two negative posts about the company on LinkedIn. The non-disparagement provision bars Lothamer from "mak[ing] negative comments about [Lothamer] or its officers, directors, current and former employees, or other agents." (Employment Agreement ¶ 13(e), ECF No. 1-3.) The magistrate judge concluded that Lothamer has not sufficiently alleged a breach of this provision because Kimmel's LinkedIn posts did not specifically refer to Lothamer, and cannot be reasonably interpreted as criticisms of the company. Lothamer objects that because the posts referenced Kimmel's employer, and his LinkedIn page indicated Lothamer was his employer, readers would interpret the posts as being about Lothamer.

In Kimmel's April 21, 2025, LinkedIn post, he stated that notions of positive workplace culture "won't keep you from getting laid off or abused by a boss that thinks at-will means you're

his personal servant." (4/21/2025 LinkedIn Post, ECF No. 1-10, PageID.103.) It is true that Kimmel's post does not refer to Lothamer by name, or state outright that he is talking about his own experiences. But a reasonable reader can infer that his words are meant as an oblique reference to his former employer (Lothamer) and former boss (Jesse Lothamer). Thus, the Court will sustain the objection and decline to dismiss the breach of contract claim regarding the April 21 post. However, as to the April 29, 2025, LinkedIn post, the Court agrees with the magistrate judge that the general references to "abuses of employment" and "at-will employment" do not allow readers to infer any specific criticism of Lothamer. (*See* 4/29/2025 LinkedIn Post, ECF No. 1-10, PageID.101.) Thus, the Court will dismiss the breach of contract claim regarding the April 29 post.

Lothamer also alleges that Kimmel violated the non-disparagement provision by sending a letter to several Lothamer employees in which he criticized the company. The magistrate judge reasoned that Lothamer cannot state a breach of contract claim as to the letter because it has not alleged damages stemming from the breach. *See Van Buren Charter Township v. Visteon Corp.*, 904 N.W.2d 192, 200 (Mich. Ct. App. 2017) ("Damages are an element of a breach-of-contract claim."). The Employment Agreement does contain a liquidated damages provision entitling Lothamer to $1,000 of damages "per day for every day that [Kimmel's] negative remark remains posted" (Employment Agreement ¶ 14), but the magistrate judge concluded that this provision does not apply because a letter does not "remain[] posted" after it is mailed.

Lothamer objects that "'posted' reasonably encompasses any form of public dissemination, including the continued circulation or availability of the letter at issue," so the liquidated damages clause applies for every day that Kimmel does not, for example, send a retraction letter. (Pls.' Objs. 6.) However, the language of the Employment Agreement forecloses this reading. The

5

phrase "remains posted" naturally applies to messages that a person has put up for public display and can remove at any time, like a post on LinkedIn or a flyer on a bulletin board. Lothamer's reading—that a letter "remains posted" until the sender formally retracts it—distorts the plain meaning of the contract. Thus, the Court will dismiss the breach of contract claim regarding the letter.

### (b) Non-Disclosure Provision

Lothamer also alleges that Kimmel violated their non-disclosure agreement (NDA) by disclosing Lothamer's valuation in his demand letter. The magistrate judge concluded that Lothamer fails to state a breach of contract claim because the NDA only bars an employee from "us[ing] the Confidential Information *disclosed to [the employee] by Lothamer* for use outside the above stated purpose" or "disclosing such Confidential Information to anyone." (NDA 1, ECF No. 1-4 (emphasis added)). Thus, since Kimmel allegedly gained the valuation through unauthorized access to Jesse Lothamer's email account rather than through Lothamer's disclosure, any use or disclosure of the valuation does not violate the NDA. Lothamer objects to this interpretation of the NDA's scope, pointing to another provision of the NDA that states the employee "shall have no right to use Confidential Information except as provided herein." (*Id.*) This provision is not explicitly limited to confidential information disclosed by Lothamer, and the Court agrees that the provision clarifies that Kimmel's non-disclosure obligations extend to information that Lothamer did not intentionally disclose to him.

However, Lothamer has not alleged that it suffered any damages from Kimmel's breach. Indeed, it is hard to see how informing fellow employees of the company's value would cause any harm. And unlike the Employment Agreement, the NDA lacks a liquidated damages clause. Thus, the Court will overrule Lothamer's objection and grant Kimmel's motion to dismiss this claim.

### 3. Fraud in the Inducement

Lothamer alleges that Kimmel committed fraud in the inducement when he made false statements to persuade Lothamer to hire him. The magistrate judge recommended dismissing this claim because, among other things, Kimmel's statements that he "could 'program anything'" and "could 'learn' PHP" (Compl. ¶¶ 56, 77) were mere "puffing" rather than factual representations. In its objections, Lothamer does not dispute that it has failed to state a claim as to these two statements. Rather, it argues that Kimmel also said "he *would* learn PHP" (Compl. ¶ 72 (emphasis added)), which is a specific commitment rather than "puffing." However, this allegation does not meet the requirements for pleading fraud under Rule 9(b) because the complaint does not indicate when and where Kimmel made that representation. *See* Fed R. Civ. P. 9(b); *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 247 (6th Cir. 2012) (Rule 9(b) "requires a plaintiff: (1) to specify the allegedly fraudulent statements; (2) to identify the speaker; (3) to plead when and where the statements were made; and (4) to explain what made the statements fraudulent."). Thus, the Court will overrule Lothamer's objection and dismiss its fraud in the inducement claim.

### 4. Conversion

Lothamer alleges that Kimmel committed conversion by keeping its valuation, Portal, and Scheduled Deposits Program. As noted above, Lothamer's complaint suggests that the valuation is merely a number, which cannot be converted. Thus, the Court will dismiss the conversion claim regarding the valuation. The magistrate judge also concluded that the Portal and Scheduled Deposits Program are intangible property that cannot be converted. Lothamer objects to this conclusion.

Conversion is a "distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Foremost Ins. Co. v. Allstate Ins. Co.,* 486 N.W.2d. 600, 606 (Mich. 1992). Intangible property can be converted if "the plaintiff's

ownership interest in intangible property was represented by or connected with something tangible." *Sarver v. Detroit Edison Co.*, 571 N.W.2d 759, 762 (Mich. Ct. App. 1997). The magistrate judge reasoned that Lothamer had not alleged such a connection to tangible property; Lothamer objects that software programs are necessarily connected to the tangible property on which they are stored. And although there is no allegation that Kimmel took that tangible property, Lothamer argues that it is possible to convert intangible property without converting the associated tangible property. *See Am. Furukawa, Inc. v. Hossain*, 103 F. Supp. 3d 864, 886 (E.D. Mich. 2015) (plaintiff stated conversion claim under Michigan law where defendant allegedly took emails off plaintiff's server).

The Court agrees with Lothamer that under Michigan law, a conversion claim may lie for the copying of software in some circumstances. The Michigan Supreme Court has suggested that an "idea could be subject to conversion if [the plaintiff] could establish an exclusive right of ownership in the idea." *Sarver*, 571 N.W.2d at 762. However, "[t]o protect an idea under a property theory requires that the idea possess property-like traits." *Id.* (quoting *Reeves v. Alyeska Pipeline Serv. Co.*, 926 P.2d 1130, 1143 (Alaska 1996)). Thus, "ideas are not the property of anyone unless expressed in a legally protected manner," such as in a copyrighted or patented work. *Id.* at 763 (citing *Joyce v. Gen. Motors Corp.*, 551 N.E.2d 172, 175 (Ohio 1990)); *see also Soulliere v. Berger*, No. 349428, 2020 WL 6373048, at *5 (Mich. Ct. App. Oct. 29, 2020) ("[T]he websites set up and operated by plaintiffs for years could be the subject of an action for conversion because they were ideas reduced to a legally recognized tangible form."); *Jason J. Armstrong, D.D.S., P.C. v. O'Hare*, No. 308635, 2014 WL 1614474, at *6 (Mich. Ct. App. Apr. 22, 2014) ("The intangible assets that have been found to be subject to conversion are not subject to personal whims and

8

preferences but instead have a solid, identifiable, intellectual base and are capable of being exclusively owned and possessed.").

The above-cited Michigan case law suggests that Kimmel can only be liable for converting Lothamer's software insofar as that software was in a legally recognized form; i.e., if it was copyrightable. However, to the extent that Lothamer's conversion claim is premised on Kimmel's duplication of a copyrighted work, it may be preempted by the federal Copyright Act, 17 U.S.C. § 1 *et seq.* *See Murray Hill Publ'ns, Inc. v. ABC Commc'ns, Inc.*, 264 F.3d 622, 636 (6th Cir. 2001) (conversion claim that contains the same elements as a copyright claim is preempted by the Copyright Act), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010). Under the doctrine of "complete preemption," any state law claim that falls within the ambit of the federal Copyright Act is recharacterized as a federal claim. *Ritchie v. Williams*, 395 F.3d 283, 286–87 (6th Cir. 2005). Because the parties have not briefed the issue of preemption or addressed whether Lothamer has stated a Copyright Act claim, the Court will decline to address dismissal of the conversion claims here and instead allow Kimmel additional time to file a separate motion to dismiss those claims that addresses preemption. Furthermore, although Kimmel's counterclaim for conversion is not at issue here because Lothamer did not move to dismiss it, the same preemption issue may apply to that claim as well, so the Court will allow Lothamer to file a motion to dismiss that claim.

### B. Kimmel's Counterclaims

#### 1. Wrongful Termination

Kimmel alleges that Lothamer wrongfully terminated him due to his refusal to participate in its allegedly illegal activities, including Lothamer's failure to report a security breach, "unauthorized alteration of customer electronic signatures, improper billing and addendum inflation practices, and misrepresentations regarding attorney oversight." (2d Am. Countercls.,

9

ECF No. 125, PageID.1683.) Kimmel learned about the signature issue from another employee, Ben Kerns, and Kimmel told Kerns to stop altering signatures. (Kerns Aff. ¶ 7, ECF No. 125-8.) On February 14, 2025, Kimmel "raised these concerns internally to [Lothamer]'s Chief Operating Officer, Brian Lorencen." (2d Am. Countercls., PageID.1685.) Three days later, Lothamer "terminated [Kimmel] and the entire IT department without explanation." (*Id.*, PageID.1686.) Later that day, "following a two-hour meeting with [Kimmel] and the IT department, [Lothamer] reinstated [Kimmel] and his team." (*Id.*) About three weeks later—on March 7—Kimmel told owner Jesse Lothamer that, in relation to the compliance and security issues, "if we all work together, we could address these issues." (*Id.*) "Immediately after [Kimmel]'s statement, Lothamer terminated [Kimmel] and the entire IT department" once again. (*Id.*) On March 26, Jesse Lothamer sent an email to Bradley Mruzek, one of the terminated employees, stating that he was "sorry it had to end this way" and indicating he would "consider" rehiring Mruzek if he had not yet found another job. (Mruzek Decl., ECF No. 125-9, PageID.1758.)

Under Michigan law, an employee can bring a wrongful discharge claim against an employer who terminates them because they "act in accordance with a statutory right or duty" or "fail[] or refus[e] to violate a law in the course of employment." *Suchodolski v. Mich. Consol. Gas Co.*, 316 N.W.2d 710, 711 (Mich. 1982). The magistrate judge recommended that the Court dismiss Kimmel's wrongful discharge claim because he has not shown a causal connection between his alleged refusal to violate the law and his termination. Specifically, the magistrate judge reasoned that Kimmel has only shown a close temporal proximity between his protected activity and his termination, which is not enough to establish causation.

However, the Court disagrees with the magistrate judge's conclusion. As Kimmel points out, mere temporal proximity *can* establish causation in a retaliation case when "an adverse

employment action occurs very close in time after an employer learns of a protected activity." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 524 (6th Cir. 2008) (retaliation under Elliott-Larsen Civil Rights Act (ELCRA) and Age Discrimination in Employment Act); *see also Gorbe v. City of Lathrup Village*, No. 356801, 2023 WL 326103, at *9 (Mich. Ct. App. Jan. 19, 2023), (retaliation under ELCRA) (plaintiff can "[p]rov[e] retaliation on the basis of temporal proximity alone [with] evidence that the employer retaliated against the employee very close in time upon learning of the employee's protected activity"). Here, the initial termination occurred three days after Kimmel discussed the legal issues with Lorencen, and the second termination occurred moments after Kimmel raised the issue with Jesse Lothamer. Furthermore, Kimmel does not rely on temporal proximity alone: the strange behavior of firing, then re-hiring, then re-firing an entire department also support the inference that Lothamer had a retaliatory motive. Thus, the Court will sustain Kimmel's objection and allow the wrongful termination claim to go forward.

### 2. WPA

Kimmel also alleges that his termination violated the WPA, which bars retaliation against an employee who "reports or is about to report" a violation of the law. Mich. Comp. Laws § 15.362; *see Chandler v. Dowell Schlumberger Inc.*, 572 N.W.2d 210, 211 (Mich. 1998). The magistrate judge recommended that the Court dismiss this claim because Kimmel does not allege facts suggesting Lothamer knew of his intention to report its alleged violations of law. Kimmel objects that an employee need not say specific "magic words" to put their employer on notice of their intent to report. *Shallal v. Cath. Soc. Servs. of Wayne Cnty.*, 566 N.W.2d 571, 577 (Mich. 1997). Be that as it may, Kimmel's allegation that he "raised [his] concerns" with Lorencen is simply not specific enough to indicate whether their conversation put Lothamer on notice of Kimmel's intent to report. Kimmel also argues that his conversation with Tammy Consavage, in which she informed him about Lothamer's potential violations of the FCA, provided notice that

11

he was going to report the company. (2d Am. Countercls., PageID.1707). However, Kimmel does not allege that he said anything in that conversation indicating his intent to report. Thus, the Court will adopt the magistrate judge's recommendation and dismiss Kimmel's WPA claim.

### 3. Constructive Fraud

Kimmel brings both fraud in the inducement and constructive fraud counterclaims against Lothamer. The fraud in the inducement claim is based on Lothamer's representations before Kimmel signed his employment contract; the constructive fraud claim is based on Lothamer's representations after Kimmel began employment. Lothamer moves to dismiss only the constructive fraud claim.

"[T]he distinction between 'actual fraud' and 'constructive fraud' is that actual fraud is an intentional misrepresentation which a party makes to induce detrimental reliance, while 'constructive fraud' is a misrepresentation which causes the same effect, but without 'a purposeful design to defraud.'" *Pigee v. DiPonio*, No. 249235, 2004 WL 2102013, at *3 (Mich. Ct. App. Sep. 21, 2004) (citing *Gen. Elec. Credit Corp. v Wolverine Ins. Co.*, 362 N.W.2d 595 (Mich. 1984)). However, Kimmel's constructive fraud claim is more accurately described as an additional fraud in the inducement claim because it is primarily based on Lothamer's allegedly false promises about future action—i.e., that Lothamer would give Kimmel an equity interest in the company. *See Samuel D. Begola Servs., Inc. v. Wild Bros.*, 534 N.W.2d 217, 219 (Mich. Ct. App. 1995) (false statements about future conduct are actionable as fraud in the inducement). Furthermore, unlike a constructive fraud claim, here Kimmel does allege that Lothamer had fraudulent intent. (*See, e.g.*, 2d Am. Countercls., PageID.1695.) Thus, the Court will analyze the claim as one for fraud in the inducement.

Kimmel alleges that Lothamer falsely claimed that it had seven out-of-state offices, that it was using a franchise model, and that Kimmel would get equity in the company. (2d Am.

Countercls., PageID.1687–1691.) However, he does not describe any particular representations about the out-of-state offices or company structure that occurred after his employment, and the representations made before his employment more properly fit under his pre-hiring fraud claim (that Lothamer has not moved to dismiss). Therefore, for the purposes of the post-hiring fraud claim, the Court will focus on the representation that Kimmel would receive an equity interest in the company. The magistrate judge recommended the Court dismiss the claim because (1) Kimmel did not sufficiently allege injury from the misrepresentations, (2) Kimmel could have determined whether the representations were truthful via investigation, and (3) it was unreasonable for Kimmel to rely on Lothamer's uncertain promises. Kimmel objects to all three of these conclusions.

First, as to injury, Kimmel alleges that Lothamer's misrepresentations during his employment caused him to work extra uncompensated hours with the expectation that he would get an equity interest in the company. (Def.'s Objs. 19–20.) Although Lothamer contends that this allegation did not appear in Kimmel's counterclaims, he did allege that he worked "significant unpaid overtime." (2d Am. Countercls., PageID.1701.) Regardless, it is plausible that the promise of equity caused Kimmel to remain at the company rather than seek other work. (*See id*., PageID.1695.) Thus, Kimmel has sufficiently alleged injury.

Second, the magistrate judge's conclusion that Kimmel could determine the truth of Lothamer's statements via investigation applies only to the representations about the company's offices and structure, not to the promises of an equity interest. The company data to which Kimmel had access would not reveal Jesse Lothamer's intentions.

Finally, as to reliance, the magistrate judge focused on Jesse Lothamer's alleged statement to Kimmel in October of 2024 that "[w]e'll get you an equity agreement in January if we still like each other." (*Id*., PageID.1690.) The Court agrees that this statement is too equivocal to establish

13

reasonable reliance. However, Kimmel also alleges that months earlier—on July 19, 2024—Jesse Lothamer

> recommitted to the equity agreement but stated he was putting the franchise expansion on hold in favor of a corporate-owned growth model. He indicated that [Kimmel]'s equity position would shift from Lothamer Franchise to Lothamer Tax Resolution. [Jesse] Lothamer reiterated his belief in these agreements, claiming that with [Kimmel] having "skin in the game," he wouldn't need to micromanage. However, because the equity would actually be in Lothamer Tax Resolution, he once again stated that he needed to wait on his lawyer to finalize the agreement.

(*Id.*) These statements are concrete representations from the owner of the company about Kimmel's future compensation. Moreover, Kimmel was a high-ranking executive, so an expectation of an equity interest is not necessarily unreasonable. Under the circumstances, Kimmel's reliance is not so unjustifiable that no jury could consider it reasonable. *See Waun v. Universal Coin Laundry Mach., LLC*, No. 267954, 2006 WL 2742007, at *6 (Mich. Ct. App. Sep. 26, 2006) (reasonableness of reliance is jury question).

In sum, the Court is persuaded that Kimmel has stated a fraud claim against Lothamer.

### 4. FCA

Kimmel alleges that Lothamer violated the False Claims Act (FCA) by retaliating against him for trying to stop the company's FCA violations. *See* 31 U.S.C. § 3730(h) (providing cause of action for employees discharged due to "efforts to stop 1 or more violations of [the FCA]"). Specifically, Kimmel alleges that he became aware that Lothamer had "misused federal funds or submitted false certifications to the U.S. Small Business Administration or affiliated lending institutions" in relation to a PPP loan. (2d Am. Countercls., PageID.1706.) Kimmel then "independently investigated the matter," and "[h]e confirmed that [Lothamer] had received a PPP loan" and "may have violated the terms of the federal loan certification." (*Id.*)

The magistrate judge recommended the Court dismiss Kimmel's FCA claim because he did not allege that decisionmakers at Lothamer were aware that he investigated the PPP loan. In

14

his objections, Kimmel argues that he "alleged internal disclosure of PPP-loan noncompliance" (Def.'s Objs. 23), but he does not cite his pleadings in support of this argument, and it does not appear he alleges any such disclosure. Kimmel does allege that Consavage told him about the PPP loan issues, but the fact that Lothamer knew Kimmel was *aware* of potential FCA violations does not entail that Lothamer knew Kimmel was trying to *stop* those violations. Thus, there is no reason to infer Lothamer terminated Kimmel because of his investigation of the PPP loan. Kimmel also points to the timing of his discussion with Lorencen and his termination, but he does not allege that he spoke with Lorencen about the PPP issues or any concern that would fall under the FCA. Thus, Kimmel has failed to state an FCA retaliation claim.

### 5. Defamation

Kimmel also brings defamation claims against Lothamer based on allegations that (1) Jesse Lothamer told third parties, including Kimmel's co-workers, that Kimmel "lacked proficiency in PHP and failed to produce any meaningful work product in that language during his employment" (2d Am. Countercls., PageID.1708); (2) Lothamer's brief in support of its motion for a temporary restraining order (TRO) states that "Kimmel just couldn't let sleeping dogs lie" (Pls.' Br. in Supp. 3, ECF No. 2-1); and (3) Lothamer's reply brief in support of its motion for a TRO describes Kimmel as "a cyber terrorist out for revenge because [his] scheme to extort $2.2 million from Lothamer failed." (Pl.'s Reply Br. 1, ECF No. 90.) The magistrate judge recommended that the Court dismiss Kimmel's defamation claims because (1) Jesse Lothamer's statements were not made in the course of his employment; (2) Jesse Lothamer's statements were subjective expressions of opinion; (3) the statement that Kimmel "couldn't let sleeping dogs lie" is not defamatory, and (4) statements made in Lothamer's briefs are protected by Michigan's judicial proceedings privilege.

In his objections, Kimmel does not address the magistrate judge's conclusion that he has failed to state a defamation claim as to Jesse's statements or the "sleeping dogs" remark, and the Court will adopt those conclusions. Kimmel's objection is instead focused on the application of the judicial proceedings privilege. Under Michigan law, statements made in legal briefs cannot be the basis of defamation liability as long as they "are relevant, material, or pertinent to the [legal] issue." *Hartung v. Shaw*, 89 N.W. 701, 701 (Mich. 1902). "What a litigant considers to be pertinent or relevant is given much freedom, and the privilege is liberally construed as a matter of public policy 'so that participants in judicial proceedings may have relative freedom to express themselves without fear of retaliation.'" *Lawrence v. Burdi*, 886 N.W.2d 748, 757 (Mich. Ct. App. 2016) (quoting *Sanders v. Leeson Air Conditioning Corp.*, 108 N.W.2d 761, 762 (Mich. 1961)). Kimmel argues that Lothamer's "cyberterrorist" statement was not relevant to this case. But the statement was a hyperbolic reference to the security breaches that Kimmel allegedly caused, which were the basis for Lothamer's TRO request. The statement was plainly relevant to this litigation, so it is privileged.[2]

As an additional reason for dismissal, the Court lacks subject matter jurisdiction over Kimmel's defamation claims related to filings in this case. The Court can only take supplemental jurisdiction over state law claims that are "part of the same case or controversy" as the federal claims in this case, 28 U.S.C. § 1367, meaning that the claims "derive from a common nucleus of operative facts." *Blakely v. United States*, 276 F.3d 853, 861 (6th Cir. 2002) (internal quotation marks omitted). The only federal claims here are Lothamer's claims under the SCA, CFAA, and

---

[2] Kimmel also argues that dismissal of his defamation claim is inappropriate because the magistrate judge granted him leave to amend that claim, which he did in his second amended answer. However, there is no basis for Kimmel's contention that dismissing the amended claim would "nullify" the order granting leave to amend. (Def.'s Objs. 26.)

DTSA (and potentially the Copyright Act), none of which share a common nucleus of operative fact with a defamation claim based on court filings.

In sum, the Court will overrule Kimmel's objection and dismiss his defamation claims.

### 6. Request to Amend

In his objections, Kimmel asks the Court to grant him leave to amend his counterclaims "should the Court deem amendment necessary." (Def.'s Obj. 31.) However, "[a] request for leave to amend almost as an aside, to the district court in a memorandum," does not qualify as a motion to amend. *Kuyat v. BioMimetic Therapeutics, Inc.*, 747 F.3d 435, 444 (6th Cir. 2014) (internal quotation marks omitted). The Court's local rules also require Kimmel to file a proposed amended pleading, *see* W.D. Mich. LCivR 5.7(f), which he has not done. If Kimmel wishes to amend his counterclaims, he can file a proper motion to do so.

### III. CONCLUSION

For the reasons discussed above, the Court will dismiss Lothamer's claims for (1) violation of the CFAA, (2) violation of the DTSA, (3) violation of the MUTSA, (4) breach of the Employment Agreement's non-disclosure provision, (5) breach of the Employment Agreement's non-disparagement provision as to the April 29, 2025, LinkedIn post and the letter, and (6) fraud. The Court will order additional briefing as to preemption of Lothamer's conversion claims, and thus hold in abeyance the motion to dismiss those claims. The other claims that survive are those for (1) violation of the SCA, (2) breach of the Employment Agreement's non-retention provision, and (3) breach of the Employment Agreement's non-disparagement provision as to the April 21, 2025, LinkedIn post. Because the Court will dismiss Lothamer's DTSA claim, it will also deny as moot Kimmel's separate motion to dismiss that claim (ECF No. 118).

The Court will also dismiss Kimmel's counterclaims for (1) violation of the WPA, (2) promissory estoppel, (3) abuse of process, (4) violation of the FCA, (5) defamation, (6) false

17

light invasion of privacy, and (7) IIED.  Kimmel's surviving claims are those for (1) termination in violation of public policy, (2) fraudulent inducement related to pre-hiring representations, (3) fraudulent inducement related to post-hiring representations (pled as constructive fraud), and (4) statutory conversion.

    An order will issue in accordance with this Opinion.

Dated: December 2, 2025            /s/ Hala Y. Jarbou  
                                                    HALA Y. JARBOU  
                                                    CHIEF UNITED STATES DISTRICT JUDGE